## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE McDONALD'S CORPORATION | ) | |
| STOCKHOLDER DERIVATIVE | ) | C.A. No. 2021-0324-JTL |
| LITIGATION | ) | |

## OPINION DISMISSING CLAIMS AGAINST DIRECTOR DEFENDANTS

Date Submitted: December 15, 2022
Date Decided: March 1, 2023

Michael J. Barry, Christine M. Mackintosh, Rebecca A. Musarra, Vivek Upadhya, Michael D. Bell, GRANT & EISENHOFFER P.A., Wilmington, Delaware; Barbara J. Hart, GRANT & EISENHOFFER P.A., New York, New York; Geoffrey M. Johnson, SCOTT+SCOTT ATTORNEYS AT LAW LLP, Cleveland Heights, Ohio; Jing-Li Yu, SCOTT+SCOTT ATTORNEYS AT LAW LLP, New York, New York; Max R. Huffman, SCOTT+SCOTT ATTORNEYS AT LAW LLP, San Diego, California; Jeffrey M. Norton, Benjamin D. Baker, NEWMAN FERRARA LLP, New York, New York; *Attorneys for Plaintiffs Teamsters Local 237 Additional Security Fund, Teamsters Local 237 Supplemental Fund for Housing Authority Employees, Teamsters Local 237 Welfare Fund, and Phyllis Gianotti.*

Garrett B. Moritz, S. Reiko Rogozen, Holly E. Newell, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Ronald L. Olson, George M. Garvey, Robert L. Dell Angelo, Brian R. Boessenecker, MUNGER, TOLLES & OLSON LLP, Los Angeles, California; *Attorneys for Defendants Enrique Hernandez, Jr., Lloyd H. Dean, Robert A. Eckert, Margaret H. Georgiadis, Richard H. Lenny, John J. Mulligan, Sheila A. Penrose, John W. Rogers, Jr., and Miles D. White, and McDonald's Corporation.*

Daniel C. Herr, LAW OFFICES OF DANIEL C. HERR LLC, Wilmington, Delaware; Shawn P. Naunton, Catherine S. Duval, Leila Bijan, ZUCKERMAN SPAEDER LLP, New York, New York; *Attorneys for Defendant Stephen J. Easterbrook.*

Kathleen M. Miller, Julie M. O'Dell, Jason Z. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; *Attorneys for Defendant David Fairhurst.*

**LASTER, V.C.**

McDonald's Corporation ("McDonald's" or the "Company") is one of the world's largest employers. The plaintiffs are stockholders of the Company who have sued derivatively on its behalf. They allege that from 2015 until 2020, the Company's directors ignored red flags about a corporate culture that condoned sexual harassment and misconduct. They contend that the Company suffered harm in the form of employee lawsuits, lost employee trust, and a damaged reputation. As defendants, they have named nine directors who served during the critical period (the "Director Defendants").

In advancing this claim, the plaintiffs rely on the principle that corporate fiduciaries cannot act loyally and in the best interests of the corporation they serve if they consciously ignore evidence indicating that the corporation is suffering or will suffer harm. To state a claim under this theory, the plaintiffs must allege facts supporting an inference that the directors knew about a problem—epitomized by the proverbial red flag—yet consciously ignored it. The plaintiffs must do more than plead that the directors responded in a weak, inadequate, or even grossly negligent manner. The pled facts must indicate a serious failure of oversight sufficient to support an inference of bad faith.

Although the Director Defendants argue otherwise, the plaintiffs have pled facts supporting an inference that the Director Defendants knew about a problem with sexual harassment and misconduct at the Company. The complaint identifies a series of events during 2018 that put the Director Defendants on notice of a threat to the Company, including (i) a wave of coordinated complaints filed with the Equal Employment Opportunity Commission ("EEOC") that contained disturbing allegations about acts of sexual harassment and retaliation at the Company, (ii) a ten-city strike by Company

workers across the United States, and (iii) an inquiry from a United States Senator seeking to investigate issues of sexual harassment and misconduct at the Company.

That is enough to support a pleading-stage inference, but there is one more, brutal fact: In December 2018, the Director Defendants learned that the Company's Global Chief People Officer and head of its worldwide human resources function, the very executive officer specifically charged with promoting a culture of inclusion and respect at the Company, had engaged in an act of sexual harassment. Not only that, but the investigation into the 2018 incident uncovered a prior incident of sexual harassment by the Global Chief People Officer in 2016. The Global Chief People Officer also had been warned about his consumption of alcohol at Company events. When the head of the human resources function has repeatedly engaged in sexual harassment, that is the most vibrant of red flags regarding a potential problem with sexual harassment and misconduct.

What the complaint does not support is an inference that the Director Defendants failed to respond. The confluence of events during 2018, including the revelations about the Global Chief People Officer, led to action. Throughout 2019, the Director Defendants engaged with the problem of sexual harassment and misconduct at the Company. They worked with Company management on a response that included (i) hiring outside consultants, (ii) revising the Company's policies, (iii) implementing new training programs, (iv) providing new levels of support to franchisees, and (v) taking other steps to establish a renewed commitment to a safe and respectful workplace.

2

Given that response, it is not possible to draw a pleading-stage inference that the Director Defendants acted in bad faith. The pled facts do not support a reasonably conceivable claim against them for breach of the duty of oversight.

In a distinct but related claim, the plaintiffs allege that the Director Defendants breached their fiduciary duties by terminating the Company's CEO without cause in November 2019 after learning that he had engaged in an inappropriate relationship with an employee. The plaintiffs argue that the Director Defendants had grounds to terminate the CEO for cause, yet acted in their own self-interest by approving a no-cause termination because they feared that if they did the right thing and terminated the CEO for cause, then they would face an ugly litigation that would expose their own failures to address the Company's problems with sexual harassment and misconduct. The plaintiffs also allege that the Director Defendants acted hastily and without conducting a thorough investigation because they did not want to confront the potential extent of their own failures. A full investigation, the plaintiffs say, would have turned up additional evidence of the CEO's misconduct, including three other improper relationships between the CEO and Company employees. In addition, the plaintiffs note that during the same month that the Director Defendants terminated the CEO without cause, they terminated the Global Chief People Officer with cause after learning that he had engaged in yet another incident of misconduct. The plaintiffs seek an inference that the Director Defendants knew the correct course of action, yet chose a no-fault termination because it was the path of least resistance and avoided a potential examination of their own oversight failures.

3

This court has previously rejected similar arguments and held that the business judgment rule protects a board's decision to terminate an executive without cause, even if the situation might support a with-cause termination. To rebut the protections of the business judgment rule, the plaintiffs advance their theory of self-interest based on the Director Defendants' mishandling of the problems with sexual harassment and misconduct at the Company, but the pled facts do not support an inference that the Director Defendants mishandled those issues. The pleading-stage record shows that the Director Defendants engaged meaningfully. It is not reasonably conceivable that the Director Defendants sought to provide the CEO with a no-fault termination out of self-interest. It is also not reasonably conceivable that the Director Defendants breached their duty of care. Assuming for the sake of argument that they had breached their duty of care by not conducting a more thorough investigation, the Company's certificate of incorporation contains an exculpatory provision, so the directors would not face liability for that shortcoming.

Reasonable minds can disagree about whether the Director Defendants made the right decision by opting initially to terminate the CEO without cause. Even if the Defendant Directors made an objectively wrong decision, the business judgment rule protects them from liability for a good faith error.

The plaintiffs have challenged two other decisions that the Director Defendants made: (i) the decision to hire the CEO in the first place, and (ii) the decision to give the Global Chief People Officer one last chance after learning of his repeated acts of sexual harassment. Those decisions are similarly debatable. The business judgment rule protects those decisions as well.

4

The plaintiffs' final claim is for waste. To plead a waste claim, a plaintiff must identify a transaction that is so one-sided that no rational person would approve it. Typically, that involves a transaction in which one side receives no meaningful consideration. Contemporary cases view waste as a means of pleading facts that would support an inference that the fiduciary defendants acted in bad faith.

The plaintiffs assert that by terminating the CEO without cause, the Director Defendants allowed him to keep millions of dollars in compensation while obtaining comparatively little for the Company in return. Although reasonable minds could disagree with the Director Defendants' course of action, the bargain is not so out of whack as to constitute waste. Some might argue that the get was inadequate to support the give and that a termination for cause would have been more beneficial to the Company and its reputation in the long run. That is not the test. The decision to terminate the CEO without cause was not so extreme as to support a pleading stage inference of bad faith.

The Director Defendants' motion to dismiss the claims against them is granted.

## I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.[1] This decision

---

[1] Citations in the form "Compl. ¶ —" refer to allegations in the plaintiffs' amended and consolidated complaint. Citations in the form "Ex. — at —" refer to exhibits to the Transmittal Declaration of S. Reiko Rogozen, which the Director Defendants filed in

examines the Director Defendants' motion to dismiss the claims against them for failure to state a claim on which relief can be granted. The factual background therefore focuses on the alleged facts pertinent to those claims.

## A.     The Company

The Company is a Delaware corporation with its principal place of business in Chicago, Illinois. When this litigation began, there were more than 36,000 McDonald's-branded restaurants in over 100 countries. The Company both operates corporate-owned restaurants and acts as a franchisor. In the year immediately preceding this litigation, the Company earned approximately $19 billion in revenue. Corporate-owned restaurants accounted for $8 billion while franchised restaurants produced $11 billion.

The Company has over 200,000 employees, and franchises employ another two million, making the Company one of the world's largest employers. Over half (55%) of all Company and franchise employees are women. At more senior levels, the percentage of women decreases, and just over one-fourth (27%) of the Company's officers are female.

Young people in entry-level positions make up a large portion of the Company's workforce, and the Company prides itself on being "America's best first job." Compl. ¶ 26. The Company's Standards of Business Conduct and its Human Rights Policy call for cultivating "respectful workplaces" and creating a professional environment that "builds trust, protects the integrity of our brand and fuels our success." *Id.* ¶ 28.

---

support of their motion. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number.

**B.      A New CEO And His New Global Chief People Officer**

In 2015, the Company faced its first sales decline in twelve years. To turn the Company around, the board of directors (the "Board") hired Stephen J. Easterbrook as CEO. Easterbrook was a longtime Company employee who served in various positions from 1993 until 2011, including as Senior Vice President for the United Kingdom and Northern Europe. After a brief hiatus, Easterbrook returned to the Company in 2013 as Executive Vice President and Chief Brand Officer. In March 2015, Easterbrook formally became CEO and started working out of the Company's headquarters in Chicago, Illinois.

When the Board appointed Easterbrook to the position of CEO, the directors knew that he was engaged in an intimate relationship with a public relations consultant who was working for the Company under a contract with a third-party firm. The plaintiffs allege that the relationship violated the terms of the Company's Dating, Nepotism and Fraternization Policy, which prohibited employees from engaging in relationships with independent contractors and vendors when the employees have "the direct or indirect authority to engage the services of such independent contractor or vendor." Compl. ¶ 46. The plaintiffs allege that as Chief Brand Officer, Easterbrook was involved in the Company's public relations efforts and therefore had direct or indirect authority over the contractor. According to the complaint, the Board promoted Easterbrook and opted to "sign off on the relationship under assurances that [the consultant] would be removed from the McDonald's account," then never followed up to confirm that she was removed. *Id.* (formatting omitted).

7

After becoming CEO, Easterbrook promptly promoted David Fairhurst to the position of Global Chief People Officer. Fairhurst, another longtime Company employee, previously served as the Company's Vice President and Chief People Officer for Europe. He and Easterbrook became close personal friends while working together in the Company's London office. Fairhurst joined Easterbrook at the Company's Chicago headquarters.

## C. A Party Atmosphere

Easterbrook and Fairhurst promoted and participated in a "party atmosphere" at the Chicago headquarters. Compl. ¶ 49. The eighth floor of the Chicago office had an open bar where executives hosted weekly happy hours. Easterbrook and Fairhurst frequently attended with their management teams. "Male employees (including senior corporate executives) engaged in inappropriate behavior at these happy hour events, routinely making female employees feel uncomfortable." *Id.* ¶ 6; *see id.* ¶ 50.

Employees frequently drank alcohol at other Company-affiliated events. Easterbrook, Fairhurst, and other Company executives, including the Senior Vice President of Human Resources, participated in drinking excursions. Easterbrook and Fairhurst developed reputations for flirting with female employees, including their executive assistants.

The Company grew to resemble a boys' club. Recruiters were encouraged to hire "young, pretty females" from high-end stores to work in administrative roles at the Chicago headquarters. *Id.* ¶ 51. Easterbrook became known as a "player" who pursued intimate relationships with staff. *Id.*

8

As the culture changed, the human resources function failed to address complaints adequately. Former Company managers reported that "HR leaders under Mr. Easterbrook ignored complaints about the conduct of co-workers and executives. Some of those people said they feared retaliation for reporting the conduct of co-workers and executives to HR." *Id.* ¶ 52. Two former executives reported that "the environment in HR during Fairhurst's tenure made employees feel as if they had little recourse for reporting bad behavior." *Id.* ¶ 59.

**D.      The Company Faces Public Scrutiny Over Sexual Harassment.**

During the year after Easterbrook and Fairhurst took over, the Company began to face increasing public scrutiny about problems with sexual harassment and misconduct. In October 2016, more than a dozen Company workers from restaurants across the nation filed complaints with the EEOC that contained disturbing allegations of sexual harassment and retaliation. Later that month, a fast-food worker advocacy group organized a walkout by Company employees in over thirty cities across the United States to draw attention to the EEOC complaints. Major news outlets covered these events.

In May 2018, the Company faced another round of EEOC complaints, this time identifying both individual instances of misconduct and broader systemic issues throughout the Company. In September 2018, Company workers from ten cities across the United States organized a one-day strike to protest sexual harassment and the failure of Company management to address it. The protest attracted the attention of lawmakers, and in December 2018, United States Senator Tammy Duckworth sent an inquiry to Easterbrook about "multiple sexual harassment complaints made by employees who work at

McDonald's Restaurants in Detroit, Chicago, Los Angeles, and six other cities." Compl. ¶ 113.

**E.     Reports Of Misconduct By Fairhurst**

In the same month that Senator Duckworth sent her inquiry, the Board received reports that Fairhurst himself had committed acts of sexual harassment. During a Company party in November 2018 for the human resources staff, Fairhurst pulled a female employee onto his lap. Over thirty Company employees witnessed the incident, and several reported it to the Company's Compliance Department. The Compliance Department evaluated the reports and "concluded that David Fairhurst behaved and put himself in a position inconsistent with the Company's Standards of Business Conduct." Compl. ¶ 54.

On December 13, 2018, the Board's Audit & Finance Committee (the "Audit Committee") discussed Fairhurst's misconduct. Easterbrook informed the Audit Committee that an employee had recently described a prior incident of sexual harassment by Fairhurst in December 2016 that had not been reported to the Compliance Department.[2] Easterbrook also reported that Fairhurst "had once before been warned about excessive drinking at Company events in the past." *Id.*

---

[2] The minutes state: "Mr. Easterbrook then described events reported by another employee about matters with Mr. Fairhurst in December 2016 that had not been previously reported to Compliance." Ex. 61 at 1. The plaintiffs interpret this sentence to mean that Easterbrook already knew about the December 2016 incident, having learned about it at some earlier point, yet he neither reported it to the Audit Committee nor took any action to address it. That is not a reasonable reading. While the minutes could have been drafted more clearly, the context makes clear that Easterbrook was describing an event from 2016 that an employee reported in 2018, as part of the investigation into the 2018 incident.

The Company ostensibly had a zero-tolerance policy for acts of sexual harassment. Under the Company's policy, Fairhurst's actions qualified as sexual harassment. Because Fairhurst had grabbed the employee and forced her onto his lap, his actions technically constituted an assault. But Easterbrook recommended a deviation from the no-tolerance policy. He proposed that Fairhurst's punishment should be "forfeiting 50% of his [target incentive plan] bonus payment for 2018" and "signing both an agreement regarding the conduct and a release." Compl. ¶ 61. The Audit Committee approved Easterbrook's proposal.

After the Audit Committee meeting, Easterbrook directed the Senior Vice President of Human Resources to inform "all participants in the event that management had appropriately addressed the matter." *Id.* ¶ 62 (formatting omitted).

To document his arrangement with the Company, Fairhurst executed a "Last Chance" letter. Ex. 62 (the "Last Chance Letter"). The Last Chance Letter confirmed that Fairhurst's behavior was not an isolated incident: "Concerns have been raised to the company in the past and recently about your alcohol consumption at company-sponsored and company-related events, and separately about your personal conduct during some of those events which have made some employees uncomfortable." *Id.* at '423. The Last Chance Letter recited that Fairhurst had "demonstrated inappropriate and disruptive behavior while under the influence of alcohol at a company-related gathering and dinner of U.S. HR staff on November 8, 2018." *Id.*

The Last Chance Letter unambiguously stated that Fairhurst's actions violated the Company's Standards of Business Conduct. It also noted that Fairhurst's misconduct put

11

"the Company at significant risk." *Id.* Despite those findings and concessions, Fairhurst continued to serve as the Company's Global Chief People Officer.

**F.    Management And The Board Take Action To Address The Company's Problems With Sexual Harassment And Misconduct.**

The events of 2018 caused Company management and the Board to engage with the issue of sexual harassment and misconduct. In a memorandum dated January 17, 2019, Jerry Krulewitch, the Company's General Counsel, reported to the Board's Public Policy & Strategy Committee (the "Strategy Committee") about the EEOC complaints and the ten-city strike. Ex. 49. Krulewitch explained in response to the focus on problems of sexual harassment and misconduct, "McDonald's teams have been proactively working to improve policies and programs related to these issues," including modified and improved policies. *Id.* at 2. Krulewitch also reported that "[w]orking with insurance, we have created financial incentives for the franchisees to take the training, [REDACTED FOR NON-RESPONSIVENESS]." *Id.*

On May 23, 2019, during a meeting of the full Board, Krulewitch reported on "recent EEOC charges" and "previous EEOC charges regarding similar topics that had been filed in 2018." Ex. 51 at 8. He noted that "since the charges in 2018, the Company had been working diligently to enhance its programs and policies with regard to sexual harassment with a deliberate focus on the restaurants." *Id.* He then described actions the Company had taken, including revising policies, providing training, offering new tools to franchisees, and engaging outside experts. *Id.* at 8–9.

In June 2019, Senator Duckworth and seven other United States Senators signed a joint letter to the Company, directed to Easterbrook, that asked ten specific questions about sexual harassment and other workplace safety issues. Ex. 86. The letter requested a response by June 25. *Id.*

Later that month, Krulewitch, Fairhurst, and Robert Gibbs, the Company's Chief Communications Officer, submitted a memorandum to the Strategy Committee. Ex. 47 (the "June 2019 Memorandum"). The memorandum noted that at earlier meetings during the year, the directors had discussed "the issue of sexual harassment, as well as the proactive work we are doing to create a safe and respectful workplace for our employees and to support the efforts of our independent owner/operators to do the same." *Id.* at 1. The memorandum also noted that during a meeting in May 2019, the Strategy Committee had scheduled "a separate meeting to discuss these issues in more detail." *Id.*

The June 2019 Memorandum summarized the situation facing the Company and management's response. Under the heading "*What is occurring?*", the memorandum described the EEOC complaints and the allegations about systemic harassment. *Id.* Under the heading "*How is McDonald's responding to the issue of allegations of sexual harassment?*", the memorandum identified steps the Company was taking, including:

- A comprehensive review and update of the Company's anti-harassment policy.

- The engagement of the Rape, Abuse & Incest National Network ("RAINN") to advise the Company. The June 2019 Memorandum described RAINN as the largest anti-sexual violence organization in the country and a pioneer in education programs about preventing sexual misconduct and harassment.

- A holistic review of the Company's training programs and the retention of Seyfarth Shaw at Work to assist the Company in providing training for both Company

13

employees and franchise restaurant employees about how to establish and maintain a safe and respectful workplace.

- Additional crew, restaurant manager, and franchisee training on harassment, unconscious bias, and workplace safety.

- The establishment of a new, third-party managed hotline for employees at franchise restaurants to report complaints of any kind.

- A shared values commitment to be signed by franchisees that included a mutual understanding and responsibility for ensuring a safe, healthy, and respectful environment.

- A franchisee guide containing best practices and recommendations on establishing and maintaining a safe and respectful workplace.

- A cultural assessment, including listening sessions to promote continuous improvement.

- An end to the Company's previous policy requiring mandatory arbitration of harassment and discrimination claims as a condition of employment.

*Id.* at 2–4.

The June 2019 Memorandum was part of the pre-reading materials for a special meeting of the Strategy Committee devoted to the subject of sexual harassment. During that meeting, Krulewitch reported on the litigation against the Company and "the progress the Company had made in its efforts to promote a safe and respectful workplace." Ex. 50 at 2. Fairhurst provided an overview of the Company's people and gender strategy, including efforts to drive gender balance and improve diversity. *Id.* At the end of the meeting, the chair of the Strategy Committee "concluded the discussion by confirming that the Company (i) has developed a comprehensive plan around the issues of sexual harassment and safe and respectful workplace environments; (ii) will continue to be

14

proactive; and (iii) will further evaluate how best to execute its strategy and be a leader on this issue." *Id.* at 3.

In September 2019, the Board received an update on the Company's Enterprise Risk Management ("ERM"). The associated presentation identified a "Respectful Workplace" as a "New Risk Theme" at the "Top Tier 2" level. Ex. 52 at '138. Under the Company's risk management system, a "Tier 1" risk is (i) "[c]ritical to McDonald's mission and values," (ii) "[a]ppropriate for ERM Committee discussion," and (iii) "[m]ay need further discussion around risk appetite." *Id.* at '142. A Tier 2 risk is one that has the "[p]otential for sustained, negative impact to brand, long term financial grown, or strategic position." *Id.* Top Tier 2 risks are "[m]ore likely to become Tier 1 risks given the right circumstances." *Id.*

That same month, during a special meeting of the Strategy Committee, Easterbrook, Fairhurst, Gibbs, and Krulewitch reported on a strategy to improve the Company's reputation as an employer. Ex. 55 at 1. A memorandum distributed to the committee identified management's "ambition to strive for a leadership position by moving beyond compliance in the area of building a respectful and safe workplace." *Id.* at 2. Management reported that they had successfully launched enhanced training "on a number of important topics including [REDACTED FOR NON-RESPONSIVENESS], sexual harassment and unconscious bias, as well as launching our Gender Balance & Diversity Program." *Id.* at 2.

## G.     The Board Terminates Easterbrook And Fairhurst.

On October 17, 2019, the Board learned that Easterbrook was engaging in a prohibited relationship with an employee. During a telephonic meeting on October 18, the

15

Board ordered outside counsel to investigate. Outside counsel did not search Easterbrook's corporate email account or his devices. Outside counsel only questioned Easterbrook and the employee who was the subject of the report. Easterbrook denied that he had engaged in relationships with any other employees, and outside counsel accepted that response.

Eight days later, during a meeting on October 26, 2019, outside counsel presented the results of the investigation. The Board decided to negotiate a separation agreement with Easterbrook that contemplated a termination without cause. The final agreement permitted Easterbrook to keep all prior compensation and to receive the full value of his severance package. His "Separation Benefits" included "a cash severance payment equal to 26 weeks of base salary, a prorated annual bonus for 2019, health insurance continuation at active employee rates for six months post-termination, continued vesting of stock options for three years post-termination and prorated vesting of performance-based restricted stock units." Compl. ¶ 74.

At the time, the Company calculated the total value of the compensation that Easterbrook received under the separation agreement to be $47,534,341, with $43,999,937 comprised of equity awards. *See* Dkt. 84 Ex. A ¶ 18. The plaintiffs object that the Company did not seek to recover a portion of the compensation Easterbrook received during his tenure as CEO. They put the combined value of Easterbrook's compensation and his severance package at $125.8 million. Compl. ¶¶ 11, 74.

During a meeting on November 1, 2019, the Board approved the separation agreement. The minutes of the meeting recite that the Board chose to terminate Easterbrook "without cause" with the goal of "minimizing disruption to the Company and its

16

stakeholders." Ex. 63 at 6. The minutes note that the Board also took into account the potential for Easterbrook to file litigation challenging a for-cause termination and the uncertainty over whether the Company "would prevail in such a dispute." *Id.* at 2.

During the meeting, the Board addressed "employment matters related to Mr. David Fairhurst." Compl. ¶ 77. The minutes do not describe the discussion other than reciting that the Company's general counsel updated the Board on "his recent conversations" with Fairhurst. *Id.* The Board terminated Fairhurst for cause. *Id.*

In a press release on November 3, 2019, the Company announced that Easterbrook was leaving the Company. The press release said only that Easterbrook had "violated company policy and demonstrated poor judgment" and described his relationship with an employee subordinate as "consensual." *Id.* ¶ 79. The press release did not disclose that the Board had fired Fairhurst.

The plaintiffs criticize how the Board documented its actions. The Board did not prepare formal minutes for its meetings on October 18 and October 26, 2019. The only written record of those meetings appears as part of the minutes for the November 1 meeting, which describe a "recap" the Board received. *Id.* ¶ 73. The plaintiffs view the absence of a contemporaneous record about highly sensitive conduct involving the Company's CEO as a reason to be suspicious about what took place.

## H. Stockholders Object To Easterbrook's Termination Without Cause.

After the announcement of Easterbrook's termination without cause, a coalition of union pension funds publicly attacked the Board's decision. The coalition asserted that it "defies belief to claim that the termination of an executive who has admitted to violating

17

an express and unambiguous provision of McDonald's Standards of Business Conduct was undertaken 'without cause.'" Compl. ¶ 85. The coalition protested that by allowing Easterbrook to keep his full severance package, the Board "failed to disincentivize violations of its code of conduct." *Id.* ¶ 86. The coalition objected that it was "hard to imagine how a board could set a worse 'tone at the top' than this, particularly considering the Company's painfully slow and still inadequate response to widespread sexual harassment in McDonald's restaurants." *Id.*

Meanwhile, on November 12, 2019, Company workers filed a class action lawsuit challenging the Company's systemic problems with sexual harassment (the "*Ries* Action"). The plaintiffs in the *Ries* Action alleged that the Company had a toxic culture and that "sexual harassment is pervasive throughout McDonald's restaurants." *Id.* ¶ 118. The *Ries* complaint contained detailed allegations about "routine, severe abuse" at Company restaurants while Easterbrook and Fairhurst were in charge. *Id.*

The *Ries* Action also detailed a lack of sexual harassment training at franchise restaurants. According to the *Ries* plaintiffs, almost two-thirds of restaurant employees worked at locations that provided no sexual harassment training. The *Ries* complaint alleged that many restaurant employees had no access to human resources support and that the Company's corporate human resources department under Fairhurst refused to help workers at franchise restaurants.

## I.     The Vote-No Campaign

In April 2020, the same coalition of union pension funds that had protested Easterbrook's termination without cause sought to change the composition of the Board.

18

In a public letter, the coalition asked Company stockholders to vote against reelecting Board Chair Enrique Hernandez, Jr. and Compensation Committee Chair Richard H. Lenny to "hold the board accountable for its poor decision-making" in terminating Easterbrook without cause. Compl. ¶ 87.

Glass, Lewis & Co. recommended that stockholders vote against the Company's say-on-pay proposal and against Lenny's reelection, noting that the Board's decision to "allow[] a significant portion of Mr. Easterbrook's outstanding equity awards to continue vesting after his departure . . . illustrates a lack of willingness on the board's part to appropriately enforce the Company policy violated by Easterbrook, and sets a poor precedent for the remaining executive team." *Id.* ¶ 88. Glass Lewis further noted that "exempting CEOs from key provisions of crucial rules around corporate policy sets a questionable tone at the top, with negative potential ramifications for a firm's culture and even the opportunity to create new, unique governance risks." *Id.*

That same month, workers filed another class action, this time on behalf of workers at Company-owned restaurants in Florida, seeking damages for sexual harassment, retaliation, and related misconduct (the "*Fairley* Action"). The plaintiffs received support from Time's Up Legal Defense Fund, an anti-sexual harassment group.

The complaint in the *Fairley* Action contained allegations similar to the *Ries* Action about systemic failures to curb sexual harassment at Company restaurants. According to the *Fairley* Action, "three out of every four female non-managerial McDonald's employees have personally experienced sexual harassment at McDonald's, ranging from unwelcome sexual comments to unwanted touching, groping, or fondling, to rape and assault." *Id.*

19

¶ 137. The *Fairley* complaint alleged that "over 70% of those who reported sexual harassment they witnessed or experienced faced some form of retaliation, with 42% reporting loss of income as a result." *Id.* The *Fairley* complaint further alleged that the Company's human resources department was completely ineffective at preventing sexual harassment and discouraged employees from lodging complaints. It cited a recent poll, which revealed that employees "at corporate restaurants are even more likely than workers at franchise restaurants to have experienced sexual harassment, with 83% of female non-managerial workers at corporate restaurants reporting having experienced at least one instance of sexual harassment, and 31% reporting having experienced eight or more types of sexual harassment." *Id.* ¶ 139.

A 2019 survey generated similar results. More than 75% of the Company's female workers reported being sexually harassed at work, and more than 71% reported that they suffered negative consequences for reporting harassment.

## J.     The Company Sues Easterbrook.

In July 2020, a Company employee reported that Easterbrook had engaged in a sexual relationship with another employee in addition to the relationship that led to his termination. This time, the Board conducted a more thorough investigation.

The investigation revealed that during 2018 and 2019, in addition to the relationship that prompted Easterbrook's termination, Easterbrook had engaged in sexual relationships with at least three Company employees. Easterbrook had used his Company email account to transmit dozens of nude, partially nude, or sexually explicit photographs and videos, including photographs of the three Company employees. His relationship with the

20

employee that prompted his termination had involved sexually explicit private messages and video calls.

The investigation revealed that Easterbrook misused Company resources to promote his relationships. Shortly after his first sexual encounter with one of the employees, Easterbrook granted her restricted stock units worth hundreds of thousands of dollars. He did the same thing days before his first sexual encounter with a second employee. Easterbrook also used the Company's private aircraft for personal trips with his paramours.

On July 21, 2020, the Board resolved to pursue litigation against Easterbrook. In August, the Company filed suit, seeking to claw back Easterbrook's severance package. The complaint alleged that Easterbrook lied during the original investigation into his misconduct and deleted incriminating evidence from his cell phone.

As part of his defense, Easterbrook contended that the Board knew about his relationships when the directors approved his separation agreement. He argued that, at a minimum, the directors should have known, and that the Board did not conduct a more meaningful investigation before agreeing to the terms of his separation because the Board did not want to generate evidence that it had turned a blind eye to Easterbrook's misconduct. Easterbrook advanced that argument to support a defense of waiver. The plaintiffs have embraced the theory to assert that the Director Defendants' acted in their own self-interest when deciding to terminate Easterbrook without cause.

In December 2021, the Company and Easterbrook reached a settlement in which Easterbrook agreed to return or forfeit cash and stock compensation worth $105 million. The settlement included mutual global releases of claims. As part of the settlement,

Easterbrook admitted that he "failed at times to uphold McDonald's values and fulfill certain of my responsibilities." Compl. ¶ 96. He did not retract his allegations that the Board knew about his misconduct.

**K.     This Litigation**

Beginning in April 2020, five months after Easterbrook's termination and contemporaneous with the "Vote No" campaign against two Company directors, various stockholders sought books and records to investigate concerns about sexual harassment and misconduct at the Company. Two stockholders filed this action. Certain stockholders who had sought books and records intervened, and the action was stayed pending resolution of their efforts to use the tools at hand to obtain information. After their investigation was complete, the current plaintiffs filed an amended and consolidated complaint.

The operative complaint asserts three counts against the Director Defendants. All of the Director Defendants have served on the Board since at least 2015. The Director Defendants (i) decided to hire Easterbrook and sign off on his relationship with the public relations consultant, (ii) were in office for the duration of Easterbrook and Fairhurst's tenures at the Company, (iii) decided to terminate Fairhurst with cause in November 2019, and (iv) decided to terminate Easterbrook without cause in November 2019. The Director Defendants who served on the Audit Committee adopted Easterbrook's recommendation to discipline Fairhurst and enter into the Last Chance Letter with him in December 2018, rather than terminating him at that point under the Company's purported policy of zero-tolerance for acts of sexual harassment and misconduct.

Count I of the complaint asserts that the Director Defendants breached their fiduciary duties by opting to terminate Easterbrook without cause. Count I also contends that the Director Defendants breached their fiduciary duties by not addressing Easterbrook and Fairhurst's known misconduct earlier. In concrete terms, the plaintiffs seem to assert that the Director Defendants should not have (i) approved Easterbrook's promotion to CEO at a time when he was having a relationship with a consultant or (ii) entered into the Last Chance Letter with Fairhurst.

Count II asserts that the Director Defendants breached their duty of oversight by failing to remedy severe, widespread sexual harassment at the Company.

Count IV is a claim for waste. The plaintiffs contend that by causing the Company to enter into the initial separation agreement with Easterbrook that granted him lucrative separation benefits, the Director Defendants signed off on an agreement that no rational person would support.

The complaint names Easterbrook and Fairhurst as defendants. In Count III, the complaint alleges that Easterbrook and Fairhurst (i) breached their duty of loyalty by engaging in sexual misconduct, (ii) violated the Company's policies by engaging in sexual misconduct, and (iii) breached their duty of oversight by failing to address the problem of sexual harassment and misconduct at the Company. The court entered an order dismissing the claims against Easterbrook because the Company released those claims when it settled with him. Dkt. 86. The court issued a decision holding that the allegations against Fairhurst stated claims on which relief could be granted. *In Re McDonald's Corp. S'holder Deriv. Litig.*, — A.3d —, 2023 WL 387292 (Del. Ch. Jan. 25, 2023).

23

## L.     The SEC Determination

On January 9, 2023, the U.S. Securities and Exchange Commission ("SEC" or "Commission") announced that it had reached a settlement with Easterbrook and the Company concerning their respective public statements about Easterbrook's termination. *See* Dkt. 84 Ex. A. The SEC found that

> Easterbrook did not disclose other physical relationships with company employees and withheld information relevant to the internal investigation. . . . Easterbrook's conduct violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act and caused violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder.

*Id.* ¶ 1. The SEC barred Easterbrook from serving as an officer or director of a public company for a period of five years and imposed a civil penalty of $400,000. *Id.* ¶¶ C, E. The SEC ordered Easterbrook to pay disgorgement and prejudgment interest of $52,728,069, but deemed that order satisfied by Easterbrook's settlement with the Company. *Id.* ¶ D.

The SEC also found that when describing Easterbrook's termination in its proxy statement, the Company violated Section 14(a) of the Exchange Act and Rule 14a-3 by failing to disclose that the Board "exercised discretion in terminating Easterbrook 'without cause' under the relevant compensation plan documents after finding that he violated corporate policy, allowing Easterbrook to retain certain equity-based compensation that would have been forfeited if the company had terminated him for cause." *Id.* ¶ 2. The SEC did not impose a penalty on the Company "based upon its cooperation in a Commission investigation or related enforcement action." *Id.* ¶ G.

24

## II. LEGAL ANALYSIS

The Director Defendants have moved to dismiss Counts I, II, and IV on multiple grounds, including for failure to state claims on which relief can be granted. *See* Ct. Ch. R. 12(b)(6). When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The motion to dismiss will be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.*

### A. Count II: The Claim For Breach Of The Duty Of Oversight

In Count II of the complaint, the plaintiffs contend that the Director Defendants breached their duty of oversight by failing to take action to address a toxic corporate culture that condoned sexual harassment and misconduct. Although starting with Count II addresses the counts of the complaint out of order, beginning there is helpful because the plaintiffs contend that the threat of liability that the Director Defendants faced on the theory advanced in Count II provided a reasonably conceivable motivation for the directors to act self-interestedly when taking the actions that the plaintiffs challenge in Count I.

The plaintiffs have failed to state a claim on which relief can be granted against the Director Defendants for breach of the duty of oversight. Although they have pled facts supporting an inference that red flags came to the attention of the Director Defendants, they have not alleged facts supporting a reasonable inference that the Director Defendants acted in bad faith in response to those red flags.

25

### 1. The Parameters Of A Claim For Breach Of The Duty Of Oversight

A claim for breach of the duty of oversight is known colloquially as a *Caremark* claim, in a tip of the judicial hat to Chancellor Allen's landmark decision. *See In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996). Before *Caremark*, the leading decision on the duty of oversight was *Graham v. Allis-Chalmers Manufacturing Co.*, 188 A.2d 125 (Del. 1963), which was interpreted to have embraced "the protective 'red flags' rule," under which directors could not be held liable for wrongdoing at the company unless they were confronted with red flags indicating the existence of wrongdoing and failed to address it. Martin Lipton & Theodore N. Mirvis, *Chancellor Allen and the Director*, 22 Del. J. Corp. L. 927, 939 (1997).

The actual analysis in *Graham* was not so stark as the manner in which the case was later understood. The plaintiffs had argued that directors could be held liable "for losses suffered by their corporations by reason of their gross inattention to the common law duty of actively supervising and managing the corporate affairs." *Allis-Chalmers*, 188 A.2d at 130. In a ruling pre-dating the adoption of gross negligence as the liability standard for the duty of care, the Delaware Supreme Court observed that "directors of a corporation in managing the corporate affairs are bound to use that amount of care which ordinarily careful and prudent [persons] would use in similar circumstances." *Id.* The plaintiffs argued that "even though they had no knowledge of any suspicion of wrongdoing on the part of the company's employees, [the directors] still should have put into effect a system of watchfulness which would have brought such misconduct to their attention in ample time

26

to have brought it to an end." *Id.* The Delaware Supreme Court rejected this argument using language that became the principal legacy of the decision:

> On the contrary, it appears that directors are entitled to rely on the honesty and integrity of their subordinates until something occurs to put them on suspicion that something is wrong. If such occurs and goes unheeded, then liability of the directors might well follow, but absent cause for suspicion there is no duty upon the directors to install and operate a corporate system of espionage to ferret out wrongdoing which they have no reason to suspect exists.

*Id.*

Despite that language, the Delaware Supreme Court recognized in *Allis-Chalmers* that directors could be held liable if they failed to act where cause for suspicion existed:

> In the last analysis, the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him. This is not the case at bar, however, for as soon as it became evident that there were grounds for suspicion, the Board acted promptly to end it and prevent its recurrence.

*Id.* The *Allis-Chalmers* decision thus indicated that directors had no duty to set up a reasonable information system to facilitate board-level oversight. They could rely on management and only needed to act when "grounds for suspicion" came to their attention. *Id.* Those rulings translated into the consensus interpretation that directors had no duty to act except in response to red flags.[3]

---

[3] *See, e.g.*, Michael J. Borden, *Of Outside Monitors and Inside Monitors: The Role of Journalists in* Caremark *Litigation*, 15 U. Pa. J. Bus. L. 921, 926–27 (2013) (observing that under *Allis-Chalmers*, "[s]o long as there were no red flags indicating a likelihood of

In *Caremark*, Chancellor Allen artfully explained why the colorful language in *Allis-Chalmers* about a system of corporate espionage "could not be generalized into a rule that, absent grounds for suspected law violation, directors had no duty to assure that an information gathering and reporting system exists to provide senior management and the board with material internal operating information, including as regards legal compliance." Lipton & Mirvis, *supra*, at 939. *Caremark*'s contribution was to explain that a board's fiduciary duties encompass the need to make a good faith effort to ensure that

> information and reporting systems exist in the organization that are reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.

---

the wrongdoing in question, the board could not be held responsible if it occurred"); Eric J. Pan, *Rethinking the Board's Duty to Monitor: A Critical Assessment of the Delaware Doctrine*, 38 Fla. St. U. L. Rev. 209, 212 (2011) ("[*Allis-Chalmers*] introduced the notion that boards have a duty to act when they become aware of wrongdoing (i.e., red flags)."); E. Norman Veasey & Michael P. Dooley, *The Role of Corporate Litigation in the Twenty-First Century*, 25 Del. J. Corp. L. 131, 138 (2000) ("The Delaware Supreme Court, in the *Graham v. Allis-Chalmers* case in the mid-'60s said directors would be liable in the event that they were warned by red flags, but perhaps not otherwise." (footnote omitted)). This approach has been compared to "the well-known aphorism that 'every dog gets one bite.'" Stephen M. Bainbridge et al., *The Convergence of Good Faith and Oversight*, 55 UCLA L. Rev. 559, 577 (2008). "Just as a dog's master is not liable unless the master knew ex ante that the dog has a propensity to bite, directors are liable under [*Allis-Chalmers*] only if they are on notice that firm employees have a propensity for misconduct. Just as a prior bite puts a dog's master on such notice, prior criminal violations or breaches of fiduciary duty can put directors on notice. Just as masters have an affirmative duty to control dogs of an inherently vicious breed, moreover, directors will be held liable when they recklessly fail to monitor an obviously untrustworthy employee." *Id.*

698 A.2d at 970. In other words, the directors had a basic duty to attempt to obtain information about what was happening within the corporation. They could not opt for the more leisurely role of clam-like passive instrumentalities, awaiting whatever tidbits of information the managerial tides brought their way.

After *Caremark*, considerable debate existed about whether the duty of oversight implicated the duty of loyalty, the duty of care, or both. The *Allis-Chalmers* decision had contemplated potential liability for both. 188 A.2d at 130. Likewise, at different points in the *Caremark* opinion, Chancellor Allen used different formulations of the duty. Some suggested liability for care or loyalty; others spoke in terms of good faith.[4] The corporation in *Caremark* had an exculpatory provision that eliminated director liability for breaches of the duty of care. *See* 698 A.2d at 971 & n.28. Theoretically, therefore, the *Caremark* framework could have contemplated liability for both, but with the exculpatory provision ruling out the possibility of liability for a breach of the duty of care.

Writing as a member of this court, Chief Justice Strine reformulated the nature of the oversight duty and held that director liability for a breach of the duty of oversight requires a showing of bad faith. *See Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). In *Stone v. Ritter*, the Delaware Supreme Court adopted the *Guttman* formulation and stated

---

[4] *See, e.g.*, Bainbridge et al., *supra*, at 596–97 (describing different passages); Robert T. Miller, *Wrongful Omissions by Corporate Directors: Stone v. Ritter and Adapting the Process Model of the Delaware Business Judgment Rule*, 10 U. Pa. J. Bus. & Emp. L. 911, 937–40 (2008) (discussing different formulations).

that a breach of the duty of loyalty, such as action in bad faith, was a "necessary condition to liability." 911 A.2d 362, 369–70 (Del. 2006); *see* Bainbridge et al., *supra*, at 595.

The *Stone* decision identified two possible paths for a plaintiff to plead a claim for breach of the duty of oversight. As the Delaware Supreme Court framed it, to survive a motion to dismiss an oversight claim for failure to plead demand futility under Rule 23.1, a plaintiff must allege particularized facts supporting a reasonable inference that either "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. This framing has led to the claims being called prong-one and prong-two *Caremark* claims. Technically, only a prong-one claim traces its lineage to *Caremark*. A prong-two claim traces its lineage to *Allis-Chalmers*.

A plaintiff typically pleads a prong-one *Caremark* claim by alleging that the board lacked the requisite information system and controls. Using more functional terminology, that species of claim can be called an "Information-Systems Claim" or an "Information-Systems Theory." A plaintiff typically pleads a prong-two *Caremark* claim by alleging that the board's information system generated red flags indicating wrongdoing to which the directors failed to respond. From a functional perspective, the second type of claim can be called a "Red-Flags Claim" or a "Red-Flags Theory." *Cf. City of Detroit Police & Fire Ret. Sys. v. Hamrock*, 2022 WL 2387653, at *17 (Del. Ch. June 30, 2022). The duties underlying

30

the two species of *Caremark* claim can be called an "Information-Systems Obligation" and a "Red-Flags Obligation," respectively.

### 2. Applying Oversight Principles To Sexual Harassment And Misconduct

Conceptually, nothing prevents a stockholder from asserting a derivative claim for breach of the duty of oversight based on problems involving sexual harassment. *See* Daniel Hemel & Dorothy S. Lund, *Sexual Harassment and Corporate Law*, 118 Colum. L. Rev. 1583, 1641, 1643–46 (2018). "[C]orporate fiduciaries who fail to monitor harassment at their firms may be liable in certain circumstances under a *Caremark* theory." *Id.* at 1641. And "corporate fiduciaries who are aware of harassment but fail to react—or who affirmatively enable harassment to continue—may be sued for breach of the duties of care and loyalty." *Id.*

Stockholder plaintiffs have brought claims for breach of the duty of oversight based on failures to address sexual harassment and obtained significant results. Stockholders of Twenty-First Century Fox, Inc. filed a derivative suit over sexual harassment at the company by Roger Ailes and Bill O'Reilly, and the company settled for a $90 million payment from its insurers and the establishment of a "Workplace Professionalism and Inclusion Counsel." *See* Stipulation & Agreement of Settlement, Compromise, & Release Ex. A (Non-Monetary Relief), *City of Monroe Empls.' Ret. Sys. v. Murdoch*, C.A. No. 2017-0833-AGB (Del. Ch. Nov. 20, 2017); Hemel & Lund, *supra*, at 1622. Stockholders of Liberty Tax, Inc., a much smaller company, achieved a proportionately more significant settlement in a suit based on sexual harassment and other misconduct by its former CEO, John Hewitt. *See* Stipulation & Agreement of Settlement & Release, *Asbestos Workers'*

31

*Phila. Pension Fund v. Hewitt*, C.A. No. 2017-0883-AGB (Del. Ch. Mar. 15, 2019); Hemel & Lund, *supra*, at 1623–24.

In this case, the plaintiffs describe their oversight claim as resting on the directors knowing about evidence of sexual misconduct and acting in bad faith by consciously failing to address the misconduct. In other words, the plaintiffs have asserted a Red-Flags Claim. They have not asserted an Information-Systems Claim. They also have not asserted that the Director Defendants consciously caused the Company to violate laws that protect against sexual harassment, such as Title VII of the Civil Rights Act of 1964 or state-level human rights laws. *See* Hemel & Lund, *supra*, at 1610, 1630. That type of claim—known colloquially as a "*Massey* Claim"—is not technically an oversight claim, but it has a similar feel. *See Lebanon Cnty. Empls.' Ret. Fund v. Collis*, 2022 WL 17841215, at *18 (Del. Ch. Dec. 22, 2022).

To plead a Red-Flags Claim, a plaintiff "must plead particularized facts that the board knew of evidence of corporate misconduct—the proverbial red flag—yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Reiter v. Fairbank*, 2016 WL 6081823, at *8 (Del. Ch. Oct. 18, 2016); *accord In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *33 (Del. Ch. Sept. 7, 2021). Framed in terms of the pleading standard for the Director Defendants' Rule 12(b)(6) motion, the plaintiffs must plead facts supporting an inference that the red flags came to the attention of the Director Defendants, as well as facts supporting an inference that the Director Defendants consciously failed to take action in response to the red flags. The pled facts must support an inference that the failure to take action was sufficiently sustained, systematic, or striking

32

to constitute action in bad faith. As an example of the last of the three, a failure to take any action to investigate problems with airplane safety after a devastating airplane crash could support the inference of bad faith necessary for a Red-Flags Claim, even though there was only a single, particularly graphic and devastating red flag. *Cf. Boeing*, 2021 WL 4059934, at *34 (identifying but declining to reach issue). "A claim that directors had notice of serious misconduct and simply brushed it off or otherwise failed to investigate states a claim for breach of duty." *Lebanon Cnty. Empls.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *20 (Del. Ch. Jan. 13, 2020), *aff'd,* 243 A.3d 417 (Del. 2020).

To plead a Red-Flags Claim, a plaintiff does not have to plead that the red flags (or a single, striking red flag) concerned "mission critical" risks. That phrase has acquired talismanic importance in the aftermath of *Marchand v. Barhill*, 212 A.3d 805 (Del. 2019), where the Delaware Supreme Court reversed this court's dismissal of an Information-Systems Claim.

In its decision, the Delaware Supreme Court used the "mission critical" phrase exactly once. When rejecting the defendants' argument that management's reports to the board on the company's general operations were enough to constitute a monitoring system, the Court said the following:

> But if that were the case, then *Caremark* would be a chimera. At every board meeting of any company, it is likely that management will touch on some operational issue. Although *Caremark* may not require as much as some commentators wish, it does require that a board make a good faith effort to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks. In Blue Bell's case, food safety was essential and mission critical. The complaint pled facts supporting a fair inference that no board-level system of monitoring or reporting on food safety existed.

33

*Marchand*, 212 A.3d at 824 (footnote omitted).

The mission critical phrase thus appeared in the Court's application of the standard for an Information-Systems Claim to the facts of the case. The rule statement in the decision was that *Caremark* "does require that a board make a good faith effort to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks." *Id.* That framing acknowledged that *Caremark* may require more, although not as much as some commentators might wish, but held that the doctrine at least requires attention to the corporation's central compliance risks.

Turning to the facts in *Marchand*, the Delaware Supreme Court reasoned that food safety was a central compliance risk because it "was essential and mission critical." *Id.* That does not mean that *Caremark* only applies to "essential and mission critical risks." Although it is fair to infer that all "essential and mission critical risks" qualify as "central compliance risks," it is also possible that some "central compliance risks" may not reach the level of "essential and mission critical."

The *Marchand* decision did not address a Red-Flags Claim. Not surprisingly, the decision did not refer to the concept of mission critical risks as part of a Red-Flags Claim.

In post-*Marchand* cases, litigants have focused intently on the "mission critical" phrase. That is understandable. For plaintiffs, the *Marchand* case provided a template for surviving a motion to dismiss, and alleging that a particular risk was "mission critical" become part of the template. For defendants, turning the application of the test into the standard made the standard tougher to meet. A case in which the facts clear the bar set by the operative test will include statements describing why that is true. By logical necessity,

34

the description will be more extreme than the test. The *Marchand* case exemplifies that reality. The phrase "essential and mission critical" deploys more intense terms to explain why those risks qualified as "central compliance risks." By taking the more intense words from the application and reframing them as the standard, the defendants can boost the standard.[5]

---

[5] Although the reframing of the standard favors the defendants in this scenario, both sides of the caption can find it advantageous. One example that I have discussed in other cases involves a response to the Delaware Supreme Court's holding in *Dell* that the management buyout in that case had sufficient indicia of pricing reliability to deserve "heavy, if not dispositive weight" for determining fair price in an appraisal. *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 23 (Del. 2017). Summarizing its reasoning, the high court characterized the sale process in that case as featuring "fair play, low barriers to entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of Mr. Dell's own votes." *Id.* at 35. After that decision, appraisal petitioners attempted to reframe those indicia as the floor for a transaction that was sufficiently reliable to warrant receiving weight in the fair value determination. By doing so, they attempted to treat the factual application as if it were the test. But all that the Delaware Supreme Court held in *Dell*—and in sister cases like *DFC* and *Aruba*—was that the sale processes in those cases were sufficiently good to deserve heavy, if not dispositive, weight. "The decisions did not address when a sale process would be sufficiently bad that a trial court could give the deal price no weight. The decisions also did not address when a sale process that was not as good would still be good enough for a trial court to give the deal price weight. Technically, the holdings did not delineate when a sale process was sufficiently good that the trial court should give it heavy if not dispositive weight. The Delaware Supreme Court could have believed the sale processes in [those cases] warranted that level of consideration without excluding the possibility that a not-as-good sale process could deserve the same treatment." *In re Appraisal of Columbia Pipeline Grp., Inc.*, 2019 WL 3778370, at *42 (Del. Ch. Aug. 12, 2019) (discussing *Dell*, *DFC Glob. Corp. v. Muirfield Value P'rs*, 172 A.3d 346 (Del. 2017), and *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128 (Del. 2019)); *accord In re Stillwater Mining Co.*, 2019 WL 3943851, at *21–22 (Del. Ch. Aug. 21, 2019), *aff'd sub nom. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3 (Del. 2020). Another example that I discussed recently involves the Delaware Supreme Court's decision in *Papendick v. Bosch GmbH*, 410 A.2d 148 (Del. 1979), where the high court addressed whether the formation of a Delaware entity could supply the necessary minimum contacts with this state to support personal jurisdiction over its parent corporation. *Id.* at 152. When applying

The *Marchand* decision actually holds that when directors fail to make any effort to establish an information system to address central compliance risks, then that failure supports an inference of bad faith. The extent to which the Information-Systems Obligation might extend to other risks depends on the facts. Time and attention are precious commodities, and with limited supplies of each, officers and directors must make judgments about what risks to monitor. When making those decisions, officers and directors are presumed to act loyally, in good faith, and with due care (*i.e.*, on an informed basis). Unless one of those presumptions is rebutted, the decision is protected by the business judgment rule. Outside of central compliance risks, including essential or mission critical risks, a plaintiff will have difficulty rebutting the business judgment rule where officers or directors have made a good faith decision regarding the level of monitoring resources, if any, to assign to a risk.

The concept of central compliance risks, including essential or mission critical risks, does not play a similar role for a Red-Flags Claim. If an officer or director learns of evidence indicating that the corporation is suffering or will suffer harm, then the officer or

---

the minimum contacts test, the senior tribunal cited several factors, including that the formation of the acquisition vehicle had been "an integral component of [the] total transaction . . . to which the plaintiff's instant cause of action relates." *Id.* at 20. Since *Papendick*, parties arguing against the assertion of personal jurisdiction have argued that the formation of a Delaware entity must be "an integral component" of the challenged transaction, thereby converting the case-specific application of the minimum contacts test into a new and more onerous integral-component test. *See Harris v. Harris*, — A.3d —, 2023 WL 165967, at *19–20 (Del. Ch. Jan. 12, 2023) (discussing the reinterpretation of *Papendick*; "The *Papendick* court did not hold that meeting 'an integral component' test was required to establish jurisdiction.").

director has an obligation to respond. To mix metaphors, a red flag can come out of the blue.

The decision about what to do in response to a red flag is one that an officer or director is presumed to make loyally, in good faith, and on an informed basis, so unless one of those presumptions is rebutted, the response is protected by the business judgment rule. That generally means that a plaintiff can only plead a Red-Flags Claim by alleging facts supporting an inference of bad faith. And that is where the concept of central compliance risks, including essential or mission critical risks, can reenter the analysis. All else equal, if a red flag concerns a central compliance risk, then it is easier to draw an inference that a failure to respond meaningfully resulted from bad faith. Vice Chancellor Slights explained this point in *Clovis* when he repeated the oft-quoted phase that "red flags are only useful . . . when visible to the careful observer," and added the gloss that "as *Marchand* makes clear, the careful observer is one whose gaze is fixed on the company's mission critical regulatory issues."[6] A fixed gaze does not mean tunnel vision, and the expectation that fiduciaries will respond more readily to red flags affecting core compliance risks does not mean that fiduciaries can ignore red flags about other risks. Put differently, an inference of bad faith is more likely when a red flag concerns an essential

---

[6] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13 (Del. Ch. Oct. 1, 2019); *accord Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *18 (Del. Ch. Aug. 24, 2020); *In re MetLife Ins. Deriv. Litig.*, 2020 WL 4746635, at *14 (Del. Ch. Aug. 17, 2020).

or mission critical risk, but a Red-Flags Claim is not dependent on the signal relating to an essential or mission critical risk.

The plaintiffs therefore were not obligated to plead that the red flags associated with the Company's culture of sexual harassment and misconduct involved a mission critical risk, nor is the court required to draw an inference of mission criticality before the plaintiffs can state a claim. But assuming that hurdle did exist, the plaintiffs cleared it.

It is easy to draw a pleading-stage inference that maintaining employee safety is both essential and mission critical. The fiduciary principle requires that directors and officers act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for the benefit of the holders of its undifferentiated equity, who have presumptively committed their permanent capital to an entity with a presumptively permanent existence. *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*18 (Del. Ch. Apr. 14, 2017). Employees perform the work that affects the value of the corporation. To remain true to the fiduciary principle and build value over the long term, corporate fiduciaries must take care of the corporation's workers.

Compliance with labor and employment law is an essential corporate obligation. Sexual harassment and misconduct render the workplace unsafe. Acts of sexual harassment and misconduct can result in serious injury to the corporation. The acts obviously harm the affected employees. At the same time, the acts jeopardize the corporation's relationship with other employees, create a risk that customers and clients will defect to competitors, and subject the corporation to potential liability under state and federal law.

38

Here, the contents of the Section 220 production provide case-specific support for viewing sexual harassment and misconduct as a serious risk. In September 2019, the Board received an update on the Company's enterprise risk that identified a "Respectful Workplace" as a "New Risk Theme" at the "Top Tier 2" level. Ex. 52 at '138. Under the Company's risk management system, Top Tier 2 risks are "[m]ore likely to become Tier 1 risks given the right circumstances." *Id.* Tier 1 risks include those that are "[c]*ritical* to McDonald's *mission* and values." *Id.* (emphasis added). The court does not have to infer that sexual harassment and misconduct constituted a mission critical risk. The Company said it.[7]

---

[7] A case from more than two decades ago does not cast doubt on the significance of sexual harassment and misconduct as a risk that corporate fiduciaries must address. *See White v. Panic*, 783 A.2d 543 (Del. 2001). The alleged harm to the corporation in the *Panic* case resulted from a board of directors having approved serial settlements in eight different sexual harassment suits filed against the corporation and its CEO. *Id.* at 552. The Delaware Supreme Court declined to draw a pleading-stage inference that the directors were on notice that the CEO had harassed female employees or engaged in conduct for which the corporation could be held liable. *Id.* Having declined to draw an inference of knowledge, the high court also declined to infer that the directors could have acted intentionally or with reckless disregard for their fiduciary duties when approving the settlements and taking other actions that allegedly condoned or encouraged the CEO's misconduct. *Id.* The Court saw no reason to view the series of settlements as "anything other than routine business decisions." *Id.* at 553. The Court also noted that the plaintiff had failed to conduct a pre-suit investigation using Section 220. *Id.* at 556–57. Since the *Panic* case, there has been much hard-won learning on the subjects of sexual harassment and misconduct, the harm they cause, and the risks they pose to a corporation. *See generally* Amelia Miazad, *Sex, Power, and Corporate Governance*, 54 U. Cal. Davis L. Rev. 1913, 1915–21 (2021) (describing changes in the corporate governance ecosystem catalyzed by the #MeToo movement)); Tom C.W. Lin, *Executive Private Misconduct*, 88 Geo. Wash. L. Rev. 327, 341 (2020) (describing the contemporary socioeconomic landscape in which the private misconduct of executives can have "very serious and often public consequences" for their

### 3. The Existence Of Red Flags In This Case

The plaintiffs' Red-Flags Claim asserts that a culture of sexual harassment and misconduct was allowed to develop at the Company. As their evidence of red flags that should have put the Director Defendants on notice, the plaintiffs cite a series of events:

- Easterbrook and Fairhurst promoted a party atmosphere at corporate headquarters that included alcohol at Company events and drinking excursions with Company employees.

- In October 2016, over a dozen Company employees filed complaints with the EEOC.

- In May 2018, over a dozen Company employees filed complaints with the EEOC.

- In September 2018, Company workers from ten cities organized a one-day strike to protest the Company's culture of sexual harassment.

- In November 2018, Fairhurst engaged in an act of sexual harassment at a party for the human resources staff.

- In December 2018, the Board learned about Fairhurst's misconduct and required that he enter into the Last Chance Letter.

- Also in December 2018, Senator Duckworth wrote a letter to the Company about sexual harassment complaints against the Company.

- In June 2019, Senator Duckworth joined with seven other United States Senators in writing to the Company and asking specific questions about sexual harassment and workplace safety.

- In October 2019, the Board learned that Easterbrook was engaging in a prohibited relationship with a Company employee.

- In November 2019, after investigating Easterbrook's misconduct, the Board terminated Easterbrook without cause.

corporations; discussing contributing factors, including "the #MeToo movement, changing understandings of public and private, and evolving societal expectations").

- Also in November 2019, the Board terminated Fairhurst with cause, inferably because he had violated the terms of his Last Chance Letter and engaged in an additional act of sexual harassment.

- Also in November 2019, workers filed the *Ries* Action against the Company alleging that it had a toxic culture that accommodates sexual harassment.

- A survey conducted in 2019, reported that more than 75% of McDonald's workers had been sexually harassed while on the job, and 71% of those employees suffered negative consequences for reporting the harassment.

- In April 2020, workers filed the *Fairley* Action against the Company, seeking damages for sexual harassment, retaliation, and related misconduct.

Although the plaintiffs reference the party atmosphere as a red flag, they do not plead when or how the Director Defendants learned about it. They instead appear to contend that the Director Defendants acted improperly by failing "to take affirmative remedial steps in the face of clear red flags from lawmakers, regulators, civil rights groups, and—perhaps most glaringly—McDonald's own employees concerning the rampant sexual harassment occurring at the Company's restaurants." Dkt. 67 at 69. They thus focus on the events that occurred in 2018 and 2019.

Relying on distinguishable precedent, the Director Defendants maintain that those events did not rise to the level of red flags.[8] They argue that the Company faces constant

---

[8] The Director Defendants cite *Fisher v. Sanborn*, 2021 WL 1197577 (Del. Ch. Mar. 30, 2021), and *Pettry v. Smith*, 2021 WL 2644475 (Del. Ch. June 28, 2021). The *Fisher* decision declined to infer that a single action brought by a government agency constituted a red flag. 2021 WL 1197577, at *12–13, 16. The events of 2018 are more striking than that. The *Pettry* decision involved shipments of cigarettes that were immaterial in the context of the company's business. 2021 WL 2644475, at *9 n.101. This case involves the much more serious issue of a safe and respectful work environment, which is an issue for all employees.

41

pressure from unions, campaign groups, media, and politicians on employment-related issues like wages and sexual harassment. Perhaps, but the events of 2018 went beyond that. It is reasonable to infer that (i) a second round of coordinated filings of multiple EEOC complaints, (ii) a ten-city strike, and (iii) the letter from Senator Duckworth constituted a collective red flag.

Regardless, the indisputable red flag came in December 2018, when the Director Defendants learned that Fairhurst, the Company's Global Chief People Officer and the executive officer charged with day-to-day responsibility for ensuring that the Company maintained a safe and respectful environment, had engaged in two acts of sexual harassment. The act of sexual harassment from November 2018 was witnessed by over thirty employees and involved Fairhurst physically pulling an employee onto his lap. The investigation into that incident uncovered another instance of sexual harassment from December 2016.

When the head of human resources has engaged in multiple acts of sexual harassment, that is enough to put directors on notice of problems in the human resources area. Such an individual has evidenced a profound failure to understand the importance of a safe and respectful workplace or what that concept requires. Having such an individual in the position of Global Chief People Officer calls into question the integrity of the Company's human resources policies and the fairness of how they are applied in practice.

The plaintiffs have pled facts supporting an inference that by the end of 2018, the Director Defendants were on notice of problems at the Company with sexual harassment

and misconduct that had caused or threatened to cause the Company harm. That satisfies the first element of their Red-Flags Claim.

### 4. The Response To The Red Flags In This Case

The plaintiffs next argue that the Director Defendants failed to respond to the red flags. That is where their Red-Flags Claim falls short.

The plaintiffs have pled facts supporting an inference that until the end of 2018, the Director Defendants were operating in business-as-usual mode. The Director Defendants received regular reports on litigation facing the Company, and those reports referenced claims like the EEOC complaints, but there are no documents in the Section 220 production that indicate any effort by the Director Defendants to investigate or address problems with sexual harassment and misconduct at the Company.

That business-as-usual attitude changed at the end of 2018. At that point, Company management began taking action, and the Director Defendants began focusing on the issue. In January 2019, management reported to the Strategy Committee about the EEOC complaints, the ten-city strike, and the communications from Senator Duckworth. *See* Ex. 49. Company management advised the Strategy Committee that teams of employees were "proactively working to improve policies and programs related to these issues," including modified and improved policies on sexual harassment and new training programs aimed at a safe and respectful workplace. *Id.* at 2. In May 2019, Company management reported on these issues to the full Board. *See* Ex. 51 at 8.

In June 2019, the Strategy Committee held a special meeting devoted to the issue of sexual harassment and misconduct. Company management provided the Strategy

43

Committee with the June 2019 Memorandum, which described the issues facing the Company and the steps that Company management was taking. Ex. 47 at 1. As discussed in the Factual Background, those steps included:

- The adoption of an updated anti-harassment policy.

- Retaining RAINN to advise the Company.

- A holistic review of the Company's training programs.

- The retention of Seyfarth Shaw at Work to design new and additional training programs.

- A new hotline for employees at franchise restaurants.

- A shared values commitment to be signed by franchisees

- A franchisee guide containing best practices and recommendations on establishing and maintaining a safe and respectful workplace.

- A cultural assessment, including listening sessions to promote continuous improvement.

- An end to the Company's previous policy requiring mandatory arbitration of harassment and discrimination claims as a condition of employment.

*Id.* at 2–4. At the end of the meeting, the chair of the Strategy Committee "concluded the discussion by confirming that the Company (i) has developed a comprehensive plan around the issues of sexual harassment and safe and respectful workplace environments; (ii) will continue to be proactive; and (iii) will further evaluate how best to execute its strategy and be a leader on this issue." Ex. 50 at 3.

The Director Defendants also elevated the importance of addressing sexual harassment and misconduct as an enterprise risk. In September 2019, the Board received an update on the Company's enterprise risk management that identified a "Respectful

44

Workplace" as a "New Risk Theme" at the "Top Tier 2" level. Ex. 52 at 14. That same month, during a special meeting of the Strategy Committee, Company management reported on a strategy to improve the Company's reputation as an employer. Ex. 55 at 1.

Finally, in November 2019, when the Board learned about Easterbrook's involvement in an improper relationship with an employee, the Board terminated him, albeit without cause. At the same meeting, after learning that Fairhurst had violated the terms of his Last Chance Letter, the Board terminated him with cause.

The plaintiffs disregard those actions and argue that it was not until July 2020 that the Strategy Committee considered adopting "[n]ew US brand standards [that] will ensure both [Company-owned restaurants] and franchisees provide safe, respectful, healthy and inclusive workplaces," including "sexual harassment training." Compl. ¶ 127. That is not a reasonable inference to draw from the pleading-stage record.

There is some evidence in the record suggesting that the interventions in 2019 did not fix the problem. Minutes from a meeting of the full Board on May 23, 2019, record the Company's general counsel making a report on another round of EEOC complaints that resembled the "the previous EEOC charges regarding similar topics that had been filed in 2018." Ex. 51 at 8. Whether the response fixed the problem is not the test. Fiduciaries cannot guarantee success, particularly in fixing a sadly recurring issue like sexual harassment. What they have to do is make a good faith effort.

The pleading-stage record shows that the Director Defendants responded to the red flags regarding the toxic culture that was developing at the Company. Because of the effort they made, it is not possible to infer that the Director Defendants acted in bad faith. The

45

claim for breach of the duty of oversight therefore fails to state a claim on which relief can be granted.

**B.      Count I: The Decisions To Promote Easterbrook To CEO, Discipline Fairhurst, And Terminate Easterbrook Without Cause**

In Count I of the complaint, the plaintiffs challenge three decisions that the Director Defendants made: (i) the decision to promote Easterbrook to CEO, (ii) the decision to discipline Fairhurst by having him enter into the Last Chance Letter, and (iii) the decision to terminate Easterbrook without cause. The business judgment rule protects each decision.

To determine whether directors have complied with their fiduciary duties, Delaware courts evaluate their actions through the lens of a standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

Delaware's default standard of review is the business judgment rule. That standard of review presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[9] Unless a plaintiff rebuts one of the elements of the rule,

_____

[9] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). In *Brehm v. Eisner*, the Delaware Supreme Court overruled seven decisions, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See* 746 A.2d 244, 253 n.13 (Del. 2000) (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*,

"the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[10] The business judgment rule thus provides "something as close to non-review as our law contemplates." *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013). This standard of review "reflects and promotes the role of the board of directors as the proper body to

480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 253. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits the cases' cumbersome subsequent history, because stating that they were overruled by *Brehm* creates the misimpression that *Brehm* rejected a series of foundational Delaware decisions.

More recently, the Delaware Supreme Court overruled *Aronson* and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993), to the extent that they set out alternative tests for demand futility. *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). The high court adopted a single, unified test for demand futility. Although the *Zuckerberg* test displaced the prior tests, cases properly applying *Aronson* and *Rales* remain good law. *Id.* This decision therefore does not identify any precedents, including *Aronson* and *Rales*, as having been overruled by *Zuckerberg*.

[10] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." (internal citation omitted)).

47

manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at \*6 (Del. Ch. July 24, 2009). *See generally* Stephen M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine*, 57 Vand. L. Rev. 83 (2004).

Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (citation omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

In between lies enhanced scrutiny, which is Delaware's "intermediate standard of review." *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 43 (Del. Ch. 2013). It applies to "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors."[11] Inherent in these situations

---

[11] *Id.*; *accord Reis*, 28 A.3d at 457–59; *see Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 42 (Del. 1994) ("[T]here are rare situations which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable."); *Dollar Thrifty*, 14 A.3d at 598 ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the

48

are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference.[12] Framed generally, enhanced scrutiny requires that the defendant fiduciaries "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007).

The analysis starts with the default standard of the business judgment rule. None of the established situations in which enhanced scrutiny applies are present in this case, rendering that standard inapplicable. The question is whether the plaintiffs have alleged facts sufficient to rebut the presumptions of the business judgment rule, thereby creating a pleading stage inference that the Director Defendants will bear the burden of proving that their actions were entirely fair. Because the Director Defendants have not argued that their

---

possibility that personal interests short of pure self-dealing have influenced the board to block a bid or to steer a deal to one bidder rather than another.").

[12] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 82 (Del. Ch. 2014), *aff'd sub nom. RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *accord Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *13 (Del. Ch. Sept. 29, 2016); *see Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decisionmaking and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *11 (Del. Ch. Dec. 10, 1998) (locating the *Unocal* and *Revlon* enhanced scrutiny standard between the business judgment rule and the entire fairness test).

decisions were entirely fair, rebutting the business judgment rule would result in the denial of their Rule 12(b)(6) motion.

At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority. *See Aronson*, 473 A.2d at 812. Consequently, to determine whether to intensify the standard of review from business judgment to entire fairness, a court counts heads. *Frederick Hsu Living Tr.*, 2017 WL 1437308, at \*26. If a director-by-director analysis leaves insufficient directors to make up a board majority, then the court will review the decision for entire fairness. *Id.*

"[T]he burden of pleading and proof is on the party challenging the decision to allege facts to rebut the presumption." *Solomon v. Armstrong*, 747 A.2d 1098, 1111–12 (Del. Ch. 1999). To plead that a director was interested and therefore cannot count toward the requisite majority, a plaintiff can allege facts showing that the director received "a personal financial benefit from a transaction that is not equally shared by the stockholders."[13] Or a plaintiff can allege facts showing that the director was a dual fiduciary

---

[13] *Rales*, 634 A.2d at 936 (citations omitted); *accord Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993) ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."); *Pogostin*, 480 A.2d at 624 ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders.").

and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders.[14] To plead that a director was not independent and therefore cannot count toward the requisite board majority, a plaintiff can plead facts showing a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits.[15]

A plaintiff also may challenge a director's ability to count as part of the requisite majority by alleging facts that call into question whether the director acted in good faith. Delaware law "clearly permits a judicial assessment of director good faith" for the purpose

---

[14] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (same); *see also Trados I*, 2009 WL 2225958, at *8 (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock").

[15] *Aronson*, 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *Friedman v. Beningson*, 1995 WL 716762, at *4 (Del. Ch. Dec. 4, 1995) (Allen, C.) ("The requirement that directors exercise *independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment*[)], directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject of whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). Classic examples involve familial relationships, such as a parent's love for and loyalty to a child. *See, e.g.*, *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999).

of rebutting the business judgment rule. *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 53 (Del. 2006); *accord eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010). Bad faith encompasses both "an intent to harm [and] also intentional dereliction of duty."[16] "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[17] "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[18] Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or

---

[16] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009); *accord Disney II*, 906 A.2d at 64–66 (defining "subjective bad faith" as "conduct motivated by an actual intent to do harm," which "constitutes classic, quintessential bad faith," and "intentional dereliction of duty" as "a conscious disregard for one's responsibilities").

[17] *Disney II*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[18] *In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 907 A.2d 693, 760–79 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[19]

### 1. The Decision To Promote Easterbrook To CEO

The plaintiffs contend that the Director Defendants breached their fiduciary duties in 2015 when they elevated Easterbrook to the position of CEO. The plaintiffs' principal objection is that when the Board made Easterbrook CEO, the directors knew that he was engaged in an intimate relationship with a public relations consultant. The plaintiffs allege that the relationship violated the terms of the Company's Dating, Nepotism and Fraternization Policy, which prohibited an employee from engaging in a relationship with an independent contractor or vendor when the employee had "the direct or indirect authority to engage the services of such independent contractor or vendor." Compl. ¶ 46.

The Director Defendants respond that Easterbrook's relationship was not a policy violation because, before Easterbrook became CEO, he did not have direct or indirect authority to engage the firm that employed the consultant. That response contradicts the complaint, which asserts that as Chief Brand Officer, Easterbrook oversaw the Company's public relations function and had direct or indirect authority over the consultant. Everyone agrees that after Easterbrook became CEO, he did have that authority, and the Board "sign[ed] off on the relationship under assurances that [the consultant] would be removed

---

[19] *RJR Nabisco*, 1989 WL 7036, at \*15; *see Guttman*, 823 A.2d at 506 n.34 ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

from the McDonald's account." *Id.* The plaintiffs object that the Board never followed up to ensure that the contractor was removed from the Company's account.

The decision to hire Easterbrook on the terms that the Director Defendants set was a classic business judgment. The plaintiffs have not pled facts sufficient to rebut any of the business judgment rule's presumptions. They have not alleged that any of the Director Defendants had an interest in the decision to promote Easterbrook, nor that any Director Defendant was otherwise not independent. A board has authority to authorize exceptions to corporate policies. Granting exceptions may be unwise, but an exception by itself does not suggest a fiduciary breach. It is not reasonably conceivable that the decision to promote Easterbrook was made in bad faith.

At most, the Director Defendants might have erred by failing to follow up on Easterbrook's relationship. That type of allegation implicates the duty of care. As in *Allis-Chalmers*, the Delaware Supreme Court has continued to recognize that directors have a fiduciary obligation to "inform themselves, prior to making a business decision, of all material information reasonably available to them."[20] But while that standard speaks of reasonableness, "under the business judgment rule director liability is predicated upon

---

[20] *Aronson*, 473 A.2d at 812; *accord Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) (quoting *Aronson*); *id.* at 877 ("Here, the issue is whether the directors informed themselves as to all information that was reasonably available to them.").

concepts of gross negligence." *Aronson*, 473 A.2d at 812. In the corporate context, gross negligence has its own special meaning that is akin to recklessness.[21]

---

[21] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) ("[T]he definition [of gross negligence in corporate law] is so strict that it imports the concept of recklessness into the gross negligence standard . . . ."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (cleaned up)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (cleaned up)); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (explaining that to be grossly negligent, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion" (cleaned up)).

In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'" *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)). This test "is the functional equivalent" of the test for "[c]riminal negligence." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). As with criminal negligence, the risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*; *see id.* § 231(a). Under this framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm." *Jardel*, 523 A.2d at 530. The comparison shows the protectiveness of Delaware's

The decision to hire Easterbrook based on an assurance that the consultant would be removed, even without any intention to follow up, did not constitute gross negligence. It does not even rise to the level of simple negligence. The Board was entitled to rely on the assurance it received from Easterbrook. *See* 8 *Del. C.* § 141(e). The allegations regarding the hiring of Easterbrook do not support a claim on which relief could be granted.

### 2. The Decision To Discipline Fairhurst Rather Than Terminate Him

The plaintiffs contend that the three Director Defendants who served on the Audit Committee breached their fiduciary duties in December 2018 when they decided to discipline Fairhurst and require that he agree to the Last Chance Letter rather than terminating him with cause. The Company had a zero-tolerance policy for sexual harassment, yet the Audit Committee made an exception for Fairhurst. The plaintiffs criticize the Audit Committee for relying on Easterbrook to report on the matter and propose a set of consequences, when Easterbrook was Fairhurst's colleague, longtime personal friend, and drinking buddy.

In hindsight, there are many reasons to disagree with the Audit Committee's decision to offer Fairhurst one last chance. Nevertheless, that decision was a classic business judgment. The plaintiffs have not alleged that any of the Director Defendants on the Audit Committee had an interest in the decision or was otherwise not independent. It

---

standard: To hold a director liable for gross negligence requires conduct more serious than what is necessary to secure a conviction for criminal negligence.

56

is not reasonably conceivable that the decision to discipline Fairhurst rather than fire him was made in bad faith.

The plaintiffs' process-based criticisms implicate the duty of care. The complaint's allegations do not support an inference that the Audit Committee lacked any pertinent information. At worst for the members of the Audit Committee, they acted unreasonably by relying on Easterbrook notwithstanding his close friendship with Fairhurst. That failing would amount to simple negligence, not gross negligence. Even if it rose to the level of gross negligence, the Director Defendants are exculpated for breaches of the duty of care, so that theory fails to state a claim on which relief can be granted. *See In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015).

The allegations regarding the disciplining of Fairhurst do not support a viable claim.

### 3. The Decision To Terminate Easterbrook Without Cause

The plaintiffs finally contend that the Director Defendants breached their fiduciary duties in November 2019 when they decided to terminate Easterbrook without cause after a short investigation that did not involve examining Easterbrook's emails or devices. The plaintiffs argue that the Director Defendants acted in a self-interested manner because they feared that if they terminated Easterbrook for cause, then he would challenge their decision, and it would become evident that the Director Defendants knew about and tolerated sexual harassment and misconduct at the Company. As the plaintiffs describe it, they seek an inference that the Director Defendants acted in bad faith by seeking "to keep secret the problems plaguing the Company—including its C-suite—with respect to pervasive sexual

57

harassment and sexual misconduct and to prevent the discovery of their own failures to put a stop to it." Dkt. 67 at 56.

As with the decision to discipline Fairhurst rather than fire him, there are many reasons to disagree with how the Board handled Easterbrook's termination. It seems likely that the Director Defendants now wish they had conducted a more thorough investigation in November 2019; learned about Easterbrook's improper relationships with three other employees; found the scandalous emails, texts, and videos; uncovered his misuse of Company resources; and terminated him for cause. In July 2020, when an employee reported that Easterbrook had engaged in an improper relationship with at least one other employee, that is what the Director Defendants did.

Assuming for the sake of analysis that the Director Defendants made a bad decision in November 2019 by not conducting a more meaningful investigation and not terminating Easterbrook for cause, that does not mean that the Director Defendants breached their duties. The business judgment rule recognizes that people can make mistakes, even when acting diligently, loyally, and in good faith.

As with the two earlier decisions that the plaintiffs challenge, the decision to terminate Easterbrook without cause was a classic business judgment. When considering similar allegations regarding costly no-fault terminations of CEOs after the CEOs engaged in misconduct that could support a for-cause termination, this court has deferred to the

directors' decision under the business judgment rule.[22] Two of those cases involved CEOs who had engaged in sexual misconduct or sexual harassment. *See Shabbouei*, 2020 WL 1609177, at *5; *Zucker*, 2012 WL 2366448, at *3–4.

The plaintiffs have not alleged that any of the Director Defendants had an interest in the decision or was otherwise not independent. The plaintiffs try to conjure an inference of bad faith from the idea that the Director Defendants were seeking to keep things quiet and protect themselves, and the plaintiffs can point to Easterbrook's assertion—in the case that the Company filed against him—that the Director Defendants knew about his conduct. That allegation, however, is not sufficient to overcome the presumption that the Director Defendants have acted in good faith. This decision has concluded that the Director Defendants did not face a threat of liability for their response to the issues of sexual harassment and misconduct. As this court has held when addressing similar arguments involving other no-fault terminations, the defendants could have rationally believed in subjective good faith that an amicable termination without cause was in the best interests of the Company.[23] True, "human nature may incline *even one acting in subjective good*

---

[22] *See Shabbouei v. Potdevin*, 2020 WL 1609177, at *11–12 (Del. Ch. Apr. 2, 2020); *Zucker v. Andreessen*, 2012 WL 2366448, at *8–10 (Del. Ch. June 21, 2012); *see also Boeing*, 2021 WL 4059934, at *36.

[23] *See Shabbouei*, 2020 WL 1609177, at *11 ("Plaintiff proclaims that the Board had a duty to make a 'decision' to fire [the CEO] before [a member of the Board] attempted to negotiate his resignation. I see no basis to impose that duty . . . . The far more reasonable decision-making process would be . . . to determine whether [the CEO] would leave peacefully on mutually acceptable terms before deciding to go to war with him." (footnote omitted)); *Zucker*, 2012 WL 2366448, at *8–10 (finding that "[a]lthough the Board *could* have elected to pay [the CEO] nothing" and plaintiff was "entitled to the presumption" on

*faith* to rationalize as right that which is merely personally beneficial." *City Cap. Assocs. Ltd. P'ship v. Interco Inc.*, 551 A.2d 787, 796 (Del. Ch. 1988). But that insight acknowledges that a person who fully rationalizes the personally beneficial conduct reaches the point of acting in subjective good faith. Unless a higher standard of review applies, the law provides no basis to challenge the director's good faith judgment, however misguided.

The criticism about an overly rapid investigation implicates the duty of care. "[I]n the world of business (as elsewhere), persons are often (or always) required to act on less than perfect or complete information." *Citron v. Fairchild Camera & Instrument Corp.*, 1988 WL 53322, at *17 (Del. Ch. May 19, 1988) (Allen, C.), *aff'd*, 569 A.2d 53 (Del. 1989). "Information is not without costs of various kinds. Whether the benefit of additional information is worth the cost—in terms of delay and in terms of alternative uses of time and money—is always a question that may legitimately be addressed by persons charged with decision-making responsibility." *Solash*, 1988 WL 3587, at *8. In other words, "the amount of information that it is prudent to have before a decision is made is itself a business

---

a motion to dismiss that the CEO could have been terminated for cause, plaintiff's allegations failed to raise a reasonable doubt that the board's decision to pay the CEO $40 million under a separation agreement "was the product of a valid exercise of business judgment"); *see also Boeing*, 2021 WL 4059934, at *36 (explaining that even if board permitted CEO to resign "to avoid further public criticism, it is reasonable to infer that doing so was in furtherance of the legitimate business objective of avoiding further reputational and financial harm").

judgment of the very type that courts are institutionally poorly equipped to make." *RJR Nabisco*, 1989 WL 7036, at *19.

The Director Defendants consulted with outside counsel, who conducted an investigation. After that investigation, in consultation with counsel, the Director Defendants made the judgment that they had sufficient information to reach a decision. Although that judgment appears to have been a poor one, it is not an actionable one.

The plaintiffs object to the lack of minutes for the meeting on October 18, 2019, when the Board initially discussed the report of Easterbrook's improper relationship, and the follow-up meeting on October 26, when the Board decided to negotiate with Easterbrook regarding a no-fault departure. This court has held previously that a board's decision to meet informally in "un-minuted" meetings to discuss allegations of sexual harassment involving a CEO did not contribute to an inference of bad faith. *Shabbouei*, 2020 WL 1609177, at *12. As the court acknowledged, the failure to keep minutes can be a cause for suspicion. *Id.* It also may backfire, as it deprives the defendants and the court of the benefit of account of what took place, prepared close in time to the events themselves. Here, as in *Shabbouei*, the lack of minutes is not sufficient to support an inference of bad faith, whether viewed in isolation or in conjunction with the plaintiffs' other allegations.

At worst for the Director Defendants, the manner in which they proceeded when determining Easterbrook's fate could constitute a breach of the duty of care. I do not believe that an inference of gross negligence is reasonable. Regardless, it would not be actionable, because the Director Defendants are exculpated from damages for that claim. Because the

61

complaint only seeks damages as a remedy, even allegations supporting an inference of gross negligence would not support a claim on which relief can be granted. *See Cornerstone*, 115 A.3d at 1180.

The SEC action provides an interesting factual coda, but it does not affect the analysis from a Delaware law standpoint. The charge against McDonald's was a strict liability offense. *See Easterbrook & McDonald's Corp.*, Securities Act Release No. 11144 (Jan. 9, 2023); *accord Hilton Worldwide Hldgs. Inc.*, Exchange Act Release No. 90052, 2020 WL 5820430, at *3 (Sept. 30, 2020). It does not provide any basis to infer bad faith on the part of the directors. If anything, the SEC's findings confirm that Easterbrook misled the Board about the extent of his misconduct. The SEC found that during an interview on October 22, 2019, the Company's outside counsel asked Easterbrook whether he had engaged in sexual relationships with employees other than the relationship the Company was investigating. Easterbrook falsely said he had not. The SEC also found that Easterbrook withheld other potentially relevant information from the Company. Dkt. 84 Ex. A ¶¶ 6–8. The Director Defendants' initial determination to terminate Easterbrook without cause was thus made in good faith based on the information that Easterbrook provided.

## C.     Count IV: The Claim For Waste

In Count IV, the plaintiffs allege that the Director Defendants' decision to permit Easterbrook to receive separation benefits, including severance, as part of a no-fault termination constituted waste. That claim fails as well.

A transaction constitutes waste when it is so one-sided that no rational person acting in good faith could approve it.[24] Put differently, it involves "an exchange that is so one-sided that no businessperson of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Brehm*, 746 A.2d at 263.

Historically, waste derived from the *ultra vires* doctrine and stood outside of the traditional framework of fiduciary review. *See generally* Harwell Wells, *The Life (and Death?) of Corporate Waste*, 74 Wash. & Lee L. Rev. 1239, 1243–48 (2017). Evidencing the different legal framework, non-unanimous stockholder ratification could not validate an action that constituted waste. *See Michelson v. Duncan*, 407 A.2d 211, 219, 223 (Del. 1979). Approval by a majority of disinterested shares could cure an unauthorized transaction with a director or officer of the corporation. *See id.* at 221–22.

Contemporary Delaware decisions have brought waste within the fiduciary framework of the business judgment rule by reconceiving waste as a means of pleading that the directors acted in bad faith.[25] "The Delaware Supreme Court has implicitly held

---

[24] *E.g.*, *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *52 (Del. Ch. Jan. 27, 2021); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *19 (Del. Ch. Oct. 10, 2016), *aff'd*, 164 A.3d 56 (Del. 2017) (TABLE); *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

[25] *See, e.g.*, *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001) ("To prevail on a waste claim or a bad faith claim, the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests."); *CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *20 (Del. Ch. May 27, 2015) (explaining that waste is "best understood as one means of establishing a breach of the duty of loyalty's subsidiary element of good faith"); *Se. Pa. Transp. Auth. v. AbbVie Inc.*, 2015 WL

that committing waste is an act of bad faith." *Disney I*, 907 A.2d at 749 (*citing White v. Panic*, 783 A.2d at 553–55). Pleading that a transaction is so one-sided as to suggest waste is thus one way to plead bad faith, although not the only way. *Id.*

The separation agreement with Easterbrook does not support a claim for waste under the traditional standard. By obtaining that agreement, the Board ended the tenure of a CEO who had engaged in an improper relationship. Through the separation agreement, the Board secured Easterbrook's swift exit with a letter of apology, a release from Easterbrook of potential claims against the Company (without giving Easterbrook a release in return), and a commitment to cooperate with the Company on post-termination matters. The separation agreement included non-competition, non-solicitation, and non-disclosure provisions. By reaching agreement with Easterbrook, the Board hoped the Company could avoid potentially costly and embarrassing litigation that would highlight problems with sexual harassment and misconduct that the Board was trying to address and put in the past. "These, by any measure, are corporate benefits," inconsistent with a traditional claim of waste. *Shabbouei*, 2020 WL 1609177, at *13.

For similar reasons, the separation agreement does not suggest a decision so extreme as to be inexplicable on any basis other than bad faith. In practice, this version of waste operates as an equitable escape hatch that permits a court to allow a claim to proceed past

1753033, at *14 n.144 (Del. Ch. Apr. 15, 2015) ("This Court has found that, doctrinally, waste is a subset of good faith under the umbrella of the duty of loyalty . . . ."), *aff'd*, 132 A.3d 1 (Del. 2016) (TABLE), *overruled on other grounds by AmerisourceBergen Corp. v. Lebanon Cnty. Empls.' Ret. Fund*, 243 A.3d 417 (Del. 2020).

the pleading stage where something appears sufficiently amiss to warrant discovery. When seemingly rational defendants have made a seemingly irrational decision, often there is a hidden conflict of interest lurking in the shadows.

The facts of this case do not approach the level that might entitle a stockholder to proceed past the pleadings on a claim that the exchange was so extreme as to support an inference of bad faith. Thus, the complaint does not state a claim for waste arising out of Easterbrook's separation agreement. *Cf. Steiner v. Meyerson*, 1995 WL 441999, at *5 (Del. Ch. July 19, 1995) (Allen, C.).

In an effort to undermine the Director Defendants' decision to terminate Easterbrook without cause, the plaintiffs point out that the Board later discovered that Easterbrook had engaged in more extensive misconduct, brought suit against him, and eventually settled that litigation for the return of $105 million in consideration. Those later events do not mean that the Board's earlier decision constituted waste. The separation agreement conferred meaningful benefits to the Company. The transaction was not so one-sided as to support an inference of bad faith. To the contrary, this decision has already found that the pled facts do not support an inference that the Director Defendants acted in bad faith. Repackaging those allegations as a claim for waste does not change the outcome.

## D. The Request To Convert The Motion To Dismiss To A Motion For Summary Judgment

The preceding analysis results in a pleading-stage dismissal of the plaintiffs' claims against the Director Defendants. The plaintiffs seek to avoid that outcome through a procedural argument. They contend that because the Director Defendants relied on matters

outside of the pleadings, the court should convert the motion to dismiss into a motion for summary judgment. Rule 12(b) states that if a defendant relies on matters outside of the pleadings when moving to dismiss a complaint under Rule 12(b)(6), then "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Ct. Ch. R. 12(b). The court declines to take that step.

The plaintiffs correctly observe that in advocating for dismissal, the Director Defendants went far beyond the complaint. Their opening brief cited only ten sentences from the complaint in a twenty-one-page statement of facts, and it referenced those sentences principally to describe allegations that the Director Defendants proceeded to rebut. Instead of meaningfully engaging with the complaint, the Director Defendants constructed their own narrative from ninety-three exhibits comprising nearly 1,400 pages. Those submissions exceeded by an order of magnitude the page count of the complaint, the motions to dismiss, and the supporting briefs put together. *See CBS*, 2021 WL 268779, at \*18–19 (making similar observation). The substance and scope of the Director Defendants' submissions have the look and feel of a motion for summary judgment, which understandably invites conversion. *See Acero Cap., L.P. v. Swrve Mobile, Inc.*, 2021 WL 2207197, at \*1 (Del. Ch. June 1, 2021) (converting motion to dismiss supported by three declarations and thirty-two exhibits into motion for summary judgment).

The Director Defendants respond that they have simply relied on documents that the complaint incorporated by reference. The Company produced books and records in response to requests from a subset of the plaintiffs under a confidentiality agreement

66

containing a provision that deemed the full production incorporated by reference into any subsequent complaint.

Whether as a matter of contract or common law, incorporation by reference enables a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks is reasonable.[26] The doctrine limits the ability of a plaintiff to take language out of context, because the defendants can point the court to the entire document. But the doctrine does not change the pleading standard that governs a motion to dismiss, nor does it permit a defendant to refute the well-pled allegations in a complaint. If there are factual conflicts in the documents or the circumstances support competing interpretations, and if the plaintiffs made a well-pled factual allegation, then the court must credit the allegation. *See Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del. 2002). The plaintiffs also remain entitled to "all reasonable inferences." *Id.* at 897. Consequently, if a document supports more than one inference, and if the inference that the plaintiffs seek is reasonable, then the plaintiffs receive the inference. *Id.* "Section 220 documents, hand selected by the company, cannot be offered to rewrite an otherwise well-pled complaint." *Clovis*, 2019 WL 4850188, at *14 n.216.

By relying affirmatively on Section 220 materials in an effort to refute the plaintiffs' allegations, the Director Defendants went beyond what the incorporation-by-reference

---

[26] *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169–70 (Del. 2006); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 70 (Del. 1995); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 & n.17 (Del. Ch. Feb. 21, 2014).

doctrine permits and invited conversion. The Company's extensive use of the redaction tool makes a Rule 56 conversion more attractive. This court has acknowledged that when producing books and records, a company may redact "material unrelated to the subject matter of the demand." *Okla. Firefighters Pension & Ret. Sys. v. Amazon.com, Inc.*, 2022 WL 1760618, at *13 (Del. Ch. June 1, 2022). That standard recognizes that a stockholder is only entitled to inspect books and records that are necessary and sufficient to accomplish the stockholder's proper purpose. *Id.* It permits a company to redact material that is unrelated to the subject matter of the demand, such as sections of a multi-subject document that clearly do not have anything to do with the purpose of the stockholder's investigation.

Here, the Company engaged in questionable redaction practices, such as recurrent partial-sentence redactions. Although an occasional sentence may address a disparate and unrelated topic that warrants a partial-sentence redaction, the Company made partial-sentence redactions frequently. It seems unlikely that the drafters of the documents in the Section 220 production injected unrelated topics into otherwise responsive sentences so often. After all, we are not dealing with James Joyce and the multi-page monologue of Molly Bloom. We are not even talking about the paragraph-length opening sentence of *A Tale Of Two Cities*. We are talking about business writing, where the parts of sentences usually relate to a particular topic. It is difficult to credit that all of the Company's partial-

sentence redactions were warranted. A document should not look like the author of a ransom note scoured it to make a missive.[27]

Similar considerations apply when parties redact individual sentences from responsive paragraphs and individual paragraphs from responsive documents. Admittedly, as the length of a text increases, so does the likelihood that redactions will be appropriate. In this case, however, several of the Company's efforts appear questionable. For example, the Company produced a set of minutes for the June 2019 special meeting of the Strategy Committee. *See* Ex. 50. The sole purpose of the meeting was to consider the issue of sexual harassment—a topic plainly responsive to the demand—yet the Company redacted a paragraph of the minutes for non-responsiveness. The Company took a similar approach to a memorandum that four executives prepared for a September 2019 meeting of the Strategy Committee. Ex. 55. The memorandum was just over one page long and addressed a single topic, yet the Company made five redactions for non-responsiveness. That seems like editing.

The Director Defendants respond that the court previously addressed the propriety of their redactions. During the Section 220 proceeding, one of the stockholders who sought books and records challenged the Company's redactions, and the court upheld the

---

[27] Lest there be confusion, this admonition addresses partial-sentence redactions *for non-responsiveness.* It does not apply to partial-sentence redactions for privilege. The general principle is the same: Redactions should be as limited as possible. A partial-sentence redaction for privilege is desirable because it helps the reader assess the assertion of privilege.

production of the redacted documents as sufficient to fulfill the stockholders' purpose of exploring corporate wrongdoing. That ruling is helpful to the Company, but it does not foreclose conversion. When determining what information is necessary to satisfy a stockholder's purpose (while simultaneously stopping at what is sufficient), a court must make a difficult prediction based on comparatively little information. The merits of a specific claim are not at issue in a Section 220 proceeding, so the court cannot evaluate the documents against a particular theory. *AmerisourceBergen Corp. v. Lebanon Cnty. Empls.' Ret. Fund*, 243 A.3d 417, 437 (Del. 2020). After a stockholder plaintiff has asserted a specific claim, the court is in a better position to draw an inference about whether the Company's redactions withheld information that should have been provided.

When the documents from a Section 220 production contain gaps, a plaintiff can seek inferences about what the redacted material might say. A court can credit those inferences, and that outcome could be worse for the defendants than if the Company had produced the documents without redactions. Alternatively, a court can convert the motion to dismiss into a motion for summary judgment and allow some level of discovery before adjudicating the motion. Full-blown merits discovery need not follow. A court can tailor the extent of discovery to the needs of the case. Requiring some measure of discovery beyond the Section 220 documents, perhaps including electronic documents and

depositions from a limited number of custodians, both provides a more thorough record and creates an additional incentive for companies not to misuse the redaction tool.[28]

The possibility that a court could convert a motion to dismiss into a motion for summary judgment if a company's redactions appear sufficiently questionable should promote the integrity of the Section 220 process and the proper use of incorporation by reference. The mechanism of contractual incorporation by reference was intended to give corporations an incentive to produce more records, with the confidence that the documents could not be mischaracterized for pleading purposes. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 798 (Del. Ch. 2016) (explaining bases for incorporation-by-reference condition), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). The production of more records has two beneficial knock-on effects. First, potential plaintiffs can better evaluate whether to bring litigation and decide against it when the books and records show that a case lacks merit. Second, the court will have a better record for purposes of early case triage and can dismiss meritless claims with greater confidence about the risk of false negatives. Excessive redactions undermine those benefits.

The issue currently before the court is whether to convert a Rule 12(b)(6) motion into a Rule 56 motion and allow limited discovery. The Director Defendants also moved for dismissal under Rule 23.1, raising the question of whether a ruling regarding conversion

---

[28] Simply requiring production of the unredacted documents could create a counterproductive incentive similar to what exists when the only consequence for failing to produce a proper privilege log is a do-over where the non-compliant party gets to try again. *See Klig v. Deloitte LLP*, 2010 WL 3489735, at *6 (Del. Ch. Sept. 7, 2010).

would apply to that motion as well. It could, and logically would, because partial redactions create the same challenges for both motions.

Nothing prevents a court from analyzing demand futility on a motion for summary judgment. This court recently did so,[29] and earlier decisions suggested that possibility in dictum.[30] As the *BGC* court noted, demand futility is a substantive rule of Delaware law, which implies that the issue could be addressed after the pleading stage, including through a motion for summary judgment and even after trial. 2021 WL 4271788, at *5.

Although the substantive nature of the demand-futility inquiry indeed implies that demand futility could remain a live issue late in the case, other Delaware authorities suggest that demand futility should be addressed early, ideally on the pleadings, although if

---

[29] *In re BGC P'rs, Inc. Deriv. Litig.*, 2021 WL 4271788, at *5 (Del. Ch. Sept. 20, 2021).

[30] In a decision denying a stay of discovery pending a ruling on the defendants' motion to dismiss under Rule 23.1, Chancellor Allen observed in dictum that "a motion challenging the standing of plaintiff to prosecute a derivative claim will, in the first instance, be addressed to the face of the complaint." *Kahn v. Tremont Corp.*, 1992 WL 205637, at *2 (Del. Ch. Aug. 21, 1992). In a footnote, he remarked: "I say in the first instance because when the pleading itself is sufficient to excuse pre-suit demand, defendants are, of course, still free to show on summary judgment by uncontradicted facts that the allegations made are untrue and there is therefore no proper standing." *Id.* at *2 n.2. In an earlier decision, after denying a motion to dismiss under Rule 23.1, Chancellor Allen remarked that "[i]f a review of the actual facts would show that these two aspects of the complaint are in fact and should in law be treated as completely independent, then that may be shown in an application for summary judgment." *Heineman v. Datapoint Corp.*, 1990 WL 154149, at *3 (Del. Ch. Oct. 9, 1990) (internal citation omitted). These comments contrast with his observations in *Harris v. Carter*, a decision discussed in the text, where he strongly endorsed the proposition that demand futility should be decided "at the filing of the complaint." 582 A.2d 222, 228 (Del. Ch. 1990).

warranted on a prompt motion for summary judgment. The other authorities indicate that a court generally should not evaluate (or reevaluate) demand futility later in the case, such as on a motion for summary judgment after the close of discovery or post-trial.

The first authority is the Delaware Supreme Court's decision in *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). At the trial level in *Zapata*, this court held that after a plaintiff had properly initiated a derivative action and proceeded beyond the pleading stage, the defendants lacked the ability to divest the plaintiff of control over the action. *Maldonado v. Flynn*, 413 A.2d 1251, 1262 (Del. Ch. 1980) (subsequent history omitted). On appeal, the high court disagreed and recognized the special litigation committee as the judicially approved method for accomplishing that feat. *Zapata*, 430 A.2d at 786. In doing so, the Delaware Supreme Court explained that "where demand is properly excused, the stockholder does possess the ability to initiate the action on his corporation's behalf" and emphasized that "some tribute must be paid to the fact that the lawsuit was properly initiated" by the derivative plaintiff. *Id.* at 784, 787. Chancellor Allen later described a *Zapata* committee as the "judicially approved method for the termination of derivative litigation through unilateral corporate action" and held that a controlling stockholder could not dispose of derivative litigation through a freeze-out merger without inviting judicial review of the transaction. *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 764 (Del. Ch. 1986). If defendants could divest a plaintiff of control over a derivative action by relitigating demand futility through a motion for summary judgment after the close of discovery or by arguing the issue on the merits after trial, then those mechanisms would provide meaningful alternatives to a *Zapata* committee, and little tribute would be paid to

73

the fact that a lawsuit had been properly initiated. The *Zapata* procedure suggests that a late-stage assessment of demand futility should not be in the cards.

Another authority is the Delaware Supreme Court's decision in *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006), which adopted the reasoning of Chancellor Allen's decision in *Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990). The issue in both cases was whether the defendants could move again for dismissal under Rule 23.1 after a change in board composition that removed disabled directors from or added new disinterested and independent directors to the board. In *Harris*, Chancellor Allen explained that "the proper time to measure demand futility is at the filing of the complaint" and declined to reconsider demand futility after a change in board composition as to claims already in litigation. 582 A.2d at 228. He reasoned that demand doctrines "ought not to be so construed as to stall the derivative suit mechanism where it has been properly initiated," nor to "interrupt litigation" that a stockholder plaintiff had been pursuing. *Id.* at 231. He explained that "[w]hen claims have been properly laid before the court and are in litigation, neither Rule 23.1 nor the policy it implements requires that a court decline to permit further litigation of those claims upon the replacement of the interested board with a disinterested one." *Id.* Instead, the board should be required to form a *Zapata* committee or to act under *Zapata* as a committee of the whole. *Id.* But if a plaintiff asserted new claims in an amended complaint that were not already validly in litigation, then the defendants could move for summary judgment as to those claims. *Id.* at 230. Sixteen years later, the Delaware Supreme Court adopted both the rule and the reasoning of *Harris v. Carter* and quoted the foregoing statements. *See Braddock*, 906 A.2d at 785, 801–02. Both *Harris v. Carter* and

74

*Braddock* indicate that demand futility only should be addressed early in the case. If the issue of demand futility remained live throughout the case, then there should not have been any impediment to reconsidering demand futility after a change in board composition.

A third authority is the Delaware Supreme Court's decision in *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726 (Del. 1988). There, the high court held that "[w]hen a corporation chooses to take a position in regards to a derivative action asserted on its behalf, it must affirmatively object to or support the continuation of the litigation." *Id.* at 731. Applying that rule to the facts of the case, the Delaware Supreme Court found that a corporation had given its "tacit approval for the continuation of the litigation" and could not assert demand futility when the corporation failed to move to dismiss under Rule 23.1 at the outset of the case. *Id.* at 731. If the issue of demand futility remained live throughout the case, then, as with other defenses, the corporation should have been able to take a pass on the Rule 23.1 motion at the pleading stage and assert the defense on a motion for summary judgment or at trial.

Admittedly, these authorities do not hold explicitly that a court cannot reconsider demand futility late in the case or after trial, but they point towards an early-stage determination, usually on the pleadings but potentially on a motion for summary judgment. In offering this interpretation, I acknowledge that a selfish interest may color my view, because I do not relish the prospect of conducting *seriatim* demand-futility analyses, first on the pleadings, then after the close of discovery on a motion for summary judgment, and then again after trial, as this court generously did in *BGC. See In re BGC P'rs, Inc. Deriv.*

*Litig.*, 2022 WL 3581641, at \*13 (Del. Ch. Aug. 19, 2022) (conducting post-trial analysis of demand futility and referencing prior assessments).

In sum, the lessons I draw from the combination of authorities are the following:

- Demand futility should be analyzed early in the case and not addressed (or readdressed) at later phases.

- Demand futility generally should be evaluated on the pleadings, without the benefit of discovery.

- Demand futility can be analyzed on summary judgment, and a court can convert a motion to dismiss into a motion for summary judgment to facilitate analysis.

- The defendants generally should expect one bite at the demand-futility apple. If the defendants believe that the allegations supporting demand futility are incorrect, then they can file a Rule 23.1 motion to preserve the defense under *Kaplan*, then move promptly for summary judgment on the issue of demand futility so that they can introduce evidence by affidavit showing that demand was not futile. Although a plaintiff would be entitled to some limited discovery under Rule 56(f), full merits discovery would not be warranted.

- There could be a situation in which a complaint presents a close call on the issue of demand futility, and the defendants opt to move to dismiss. If the motion fails, then the court would have discretion to entertain a motion for summary judgment on the demand futility issue, but the defendants could not claim a right to a redo.

Although the foregoing analysis supports the theoretical possibility of conversion, the facts of this case do not warrant it. First, the Director Defendants only introduced documents from the Section 220 production, so they technically stayed within the scope of the incorporation-by-reference provision to which the plaintiffs agreed.

Second, this court did rule previously that the redactions in the Section 220 documents were proper. Although not determinative for purposes of conversion, that decision deserves weight.

76

Third, the most extensive redactions appear in documents pre-dating the end of 2018, when it seems plain that the Board was operating in business-as-usual mode and not taking any action to address concerns about sexual harassment or misconduct at the Company. For purposes of the motion to dismiss, the court has credited the plaintiffs with the inference that the Board was operating in business-as-usual mode during that period.

Fourth, it is not reasonable to infer that the contents of the redactions in the documents from 2019 could affect the outcome of the motion to dismiss. Those documents demonstrate that management and the Director Defendants were seeking to respond to the red flags about sexual harassment and misconduct. Just as it seems unlikely that the redacted material addressed unrelated topics, it also seems unlikely that the redactions contained indications that management and the Director Defendants were not trying to respond to the red flags. It is reasonable to infer that the redacted portions could contain candid self-assessments along the lines of "we wish we had done this sooner" or "we have identified problems with our existing policies." Self-assessments of that type would not support a claim on which relief can be granted. They would reinforce the inference that management and the Director Defendants were responding to the red flags, including by acknowledging areas where improvement was clearly needed. When considering the redactions in context, it is not reasonably conceivable that they could contain snippets sufficient to draw an inference that the Director Defendants acted in bad faith. For example, it is not reasonable to infer that the redacted portions might contain statements along the lines of "we expect to these steps to generate positive PR, but we don't intend to expend resources enforcing any of our new policies or procedures."

77

The court will not convert either the Rule 12(b)(6) motion or the Rule 23.1 motion into a motion for summary judgment.

## III. CONCLUSION

The plaintiffs have failed to plead a claim against the Director Defendants for breach of the duty of oversight. They have failed to plead a claim against the Director Defendants for breach of fiduciary duty in connection with the decisions to promote Easterbrook to CEO, to discipline Fairhurst, and to terminate Easterbrook without cause. The plaintiffs have failed to plead a claim against the Director Defendants for waste. The claims against the Director Defendants are dismissed under Rule 12(b)(6).